**2021 UT App 117**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,

*v.*

EDDIE RAY BOZARTH,
Appellant.

Opinion
No. 20190397-CA
Filed November 4, 2021

Fifth District Court, Beaver Department
The Honorable Keith C. Barnes
No. 171500096

Leah Jordana Aston, Attorney for Appellant

Sean D. Reyes and Thomas Brunker, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES JILL M. POHLMAN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     The police responded to a report that parolee Eddie Ray Bozarth was acting erratically and might be using drugs. Bozarth's parole officer (the parole officer) directed police to search Bozarth's bedroom, where they discovered drugs and associated paraphernalia. Bozarth was charged with multiple crimes, and the district court appointed counsel (counsel) to aid his defense. Unhappy with counsel's representation, Bozarth elected to represent himself, assisted by a new attorney (standby counsel). With the help of standby counsel, Bozarth unsuccessfully sought to suppress the evidence police had seized during the search of his bedroom. Subsequently, Bozarth pled guilty to misdemeanor drug possession. Bozarth now appeals with the assistance of appellate counsel, arguing that the

district court improperly denied his motion to suppress, that standby counsel was constitutionally ineffective, and that the court failed to ensure that Bozarth knowingly and intelligently waived his right to counsel. We affirm.

## BACKGROUND

¶2 One evening, dispatch received a call from Bozarth's mother (mother) who claimed Bozarth "was acting strangely and crazy out in his yard." Bozarth had been residing with mother and she indicated that, due to Bozarth's behavior over the prior week, she suspected he had reverted to using drugs. Dispatch relayed the information to a police deputy (the deputy) who was familiar with Bozarth. The deputy immediately called the parole officer.

¶3 The parole officer asked the deputy and the accompanying corporal (the corporal) to check on Bozarth and "make sure [mother] was okay." In his almost eight years working as Bozarth's parole officer, the parole officer had never received a call from mother, and he found it "very concerning." Because the parole officer "ha[d] concerns that there may be drug use going on," he also asked the deputy to contact him again after assessing the situation to determine whether to search Bozarth's bedroom. The parole officer informed the deputy that Bozarth's parole agreement contained a search clause, which reads,

> Pursuant to state law . . . , while I am on parole I am [s]ubject to search and seizure of my person, property, place of temporary or permanent residence, vehicle, personal effects by any parole officer or by any other law enforcement officer at any time (with or without a search warrant, and with or without cause)[]; however a law enforcement officer who is not my parole officer

must either have prior approval from a parole officer or have a warrant for a search of, or seizure from, my residence.

¶4    Upon arriving at mother's residence, the police found Bozarth in the driveway acting in a way they described as excited, aggressive, and confrontational. The police exited their vehicles and informed Bozarth they were "just there to check on him and make sure everything was okay." Bozarth proceeded to rush quickly toward the corporal, "getting in his face," and the corporal ordered Bozarth to stop. Due to Bozarth's agitated state and their knowledge of his history of fighting with officers, the police proceeded to handcuff him. The corporal suspected Bozarth was acting under the influence of drugs, so the corporal shined a flashlight in Bozarth's eyes and observed that his pupils reacted only slightly to the light, an indication that he might be "using some type of stimulant." When the corporal headed inside to check on mother, the deputy remained outside with Bozarth, as he struggled and yelled continuously.

¶5    Mother invited the corporal into her home. According to the corporal, although mother was "obviously upset," she confirmed that she was safe and unharmed. Mother then reiterated her concerns that Bozarth had relapsed and that she feared his increasingly aggressive behavior. At that point, the corporal contacted the parole officer and apprised him that Bozarth appeared to be on drugs. The parole officer asked the corporal to search Bozarth's room. Mother likewise authorized the corporal to "check anywhere and anything that [he] wanted."

¶6    When the corporal entered Bozarth's bedroom, he saw "tinfoil, a glass pipe with burnt residue in it, and a straw that had a crystalline substance inside it" sitting on top of a rolltop desk. Based on the corporal's training and experience, he surmised that the items were drug paraphernalia and that the

substance inside the pipe was methamphetamine. Bozarth was booked into jail on possession of a controlled substance with priors, a third-degree felony; possession of drug paraphernalia, a class B misdemeanor; and disorderly conduct, a class C misdemeanor.

¶7 At the initial hearing, the district court informed Bozarth of his charges and the associated maximum and minimum sentences. Because Bozarth had applied for a public defender, the court appointed counsel to assist with Bozarth's defense. Bozarth, however, told the court: "[I] reserve the right to retake the helm and control my own destiny if I need to if [counsel] does not assert my will upon my defense."

¶8 At the pretrial conference, counsel indicated that Bozarth wanted the case to go in a direction that counsel believed was not in Bozarth's best interest. Counsel petitioned the court "to determine whether Mr. Bozarth needs to represent himself." The district court then explained counsel's role, and Bozarth requested legal materials so he could do his own research to "verify" the credibility of legal printouts provided by counsel. Jail personnel and counsel offered to make arrangements for Bozarth to obtain legal books, and the court set the case for a review hearing to give Bozarth and counsel time to determine how to proceed.

¶9 Two weeks later, counsel told the court,

> [I]t is my understanding Mr. Bozarth would like to represent himself from now on. I have indicated to him his options. And I find Mr. Bozarth to be more educated in the law than other people. He's cognizant of what his rights are. . . . It's my understanding that Mr. Bozarth would still like to represent himself.
>
>      . . . .

> . . . Mr. Bozarth, as you can tell, he's educated.
> He knows the law to some degree. He's very well
> versed to some degree.

The court then asked Bozarth, "Do you want [counsel] aboard or not?" To which Bozarth responded, "I do not. I want to represent myself." The court acknowledged Bozarth's position, and Bozarth continued, "I would like assistance. . . . I would like assistance of counsel. Assistance. That means when I ask for law it doesn't take me three months to get the constitution." Bozarth claimed that he had limited access to legal materials, but jail personnel refuted that statement, insisting Bozarth had never asked to access the jail library that was available to him. Additionally, counsel disclosed that he had delivered two books of court rules and procedure for Bozarth's use. Bozarth asked for more materials, the rules of professional conduct, and the rules of judicial conduct, asserting, "I am entitled to all the laws, because all the laws are applied to me. I am entitled to read them, study them, have knowledge[,] be able to write proper meaningful papers to the court."

¶10 After hearing from all parties—but without conducting a specific colloquy with Bozarth designed to ascertain whether Bozarth's waiver of his right to counsel was knowing and voluntary—the court appointed standby counsel "on a limited basis to assist" Bozarth. The court also conferred with jail personnel to ensure that Bozarth had access to legal materials. Bozarth indicated that he intended to file a motion to suppress and attempted to give the court documents relating to accusations he had against jail personnel. In response, the court described how it receives information, explaining,

> So you need to realize that you are representing
> yourself. . . . [Y]ou need to file the appropriate
> documents. Usually, they are called a motion. And

then the other party has a right to respond. Then you have a right to reply.

. . . .

. . . And then there's going to be a notice to submit filed to the court. And then that will let the court know what [action] the court needs to take.

Bozarth expressed frustration that he could not give documents directly to the court and requested additional direction but was told, "[The court] can't instruct you now that you are going to be representing yourself."

¶11 Bozarth next attended court for a status hearing a few months later. Standby counsel shared concerns that Bozarth misunderstood the role of standby counsel because Bozarth was asking standby counsel to file civil claims against the county. The court clarified to standby counsel, "Bozarth's going to be representing himself, but you are there to advise him" on the criminal charges stemming from the search of his bedroom. Turning to Bozarth, the court explained, "[Y]ou are representing yourself, but you have [standby counsel] on your side." And it followed up by asking,

[W]hat role do you want [standby counsel] to play in your criminal case? . . . [A]re you wanting [standby counsel] to be . . . the one that is going to be presenting opening, closing, asking questions at trial, and you are going to be quiet, or are you going to be the one that is, that's taking the lead?

Bozarth declared, "I'll proceed with my own. Because I am going to ask the questions . . . . As I told you, you assigned him to be my assistant, my assistant." The court reiterated that standby counsel was available should Bozarth need assistance, but Bozarth was in charge of his representation. To this, Bozarth

said, "Correct. And that's what I had the impression of also." The court proceeded to remind Bozarth that standby counsel was assisting on a limited basis and did "not have any legal responsibility" to help with items pertaining to civil claims or other criminal complaints.

¶12 The parties then discussed Bozarth's intention to file a motion to suppress. Because the trial date was approaching, the court informed Bozarth that the State "has a right to respond to [the motion] within a two-week period of time." In order to file the suppression motion and have an evidentiary hearing, Bozarth agreed to postpone trial. The court proceeded to confirm that Bozarth had all the relevant evidence needed for the suppression hearing and trial. The State alerted the court that it had insufficient evidence to proceed with the second and third charges and consequently, it would only be trying Bozarth for possession of a controlled substance with priors. The State also informed Bozarth it would be willing to accept a plea on the remaining charge and made an offer to resolve the case. Bozarth declined.

¶13 A week before the evidentiary hearing, Bozarth filed his motion to suppress the evidence seized from his bedroom. The limited lead time precluded the State from responding to the motion in writing. Nevertheless, the parties wished to proceed with the hearing, with briefing to follow. The court instructed standby counsel to file a memorandum supporting Bozarth's suppression motion, as requested by Bozarth, within a month. And the court also took some time to explain to Bozarth how the briefing schedule would work and what each filing would look like.

¶14 The evidentiary hearing proceeded with the parole officer, the deputy, the corporal, and finally Bozarth, all testifying to the facts surrounding the search. Before the first witness was called, the court described the process for the

hearing and told Bozarth what would be required of him, including adherence to the rules of evidence, and how standby counsel could assist. As the hearing began, Bozarth invoked the exclusionary rule, requesting that testifying individuals remain outside the courtroom when not testifying. Bozarth then conducted the majority of the hearing with standby counsel providing objections, procedural direction, and other support as necessary. The crux of Bozarth's argument was that the police conducted an improper search under the Fourth Amendment because he had not authorized them to search his bedroom.

¶15 Shortly after the hearing, standby counsel requested, and was granted, a one-week extension for filing the memorandum in support of Bozarth's suppression motion. Inexplicably, the memorandum was not filed for another three months. In the interim, Bozarth mailed a variety of handwritten motions and other miscellaneous documents to the court; many of them included complaints about standby counsel.

¶16 Some three months after the tardy memorandum was filed, the parties returned to court for a ruling on the motion to suppress. At the outset of the hearing, Bozarth addressed the court to complain about standby counsel's delayed memorandum. The court then proceeded to issue its ruling, denying the motion to suppress for three alternative reasons. First, after finding that the corporal had searched Bozarth's bedroom only upon instruction from the parole officer, the court concluded that Bozarth's parole agreement authorized a suspicionless search. Second, the court concluded that the search had been authorized because mother, the homeowner, consented to the search. Third, the court determined that even if a parole search required justification, there had been "reasonable suspicion and probable cause to conduct a search" based on the facts. Accordingly, the court set a trial date.

¶17 The next month, Bozarth filed a motion to terminate standby counsel and appoint new counsel to assist his defense. In the motion, Bozarth listed grievances with standby counsel that Bozarth claimed denied him effective assistance of counsel. The court denied the motion after finding standby counsel had been "attendant" and acting with Bozarth's "best interests at heart." Of his own accord, Bozarth terminated standby counsel and opted to proceed without assistance.

¶18 Bozarth then proceeded to negotiate a plea agreement in open court. Under the agreement, Bozarth would plead to a reduced class A misdemeanor with one-year jail time and credit for the eighteen months served, reserving his right to appeal all prior objections including those based on ineffective assistance of counsel. Bozarth told the court that he wanted "to reserve all those objections . . . that I have made, I don't want to waive any of those, . . . [l]ike, ineffective assistance of counsel and some of that other stuff I want to revisit. . . . So I'm trying to reserve those." The State agreed to Bozarth's terms, and he signed a statement pleading no contest to the reduced charge. Below his signature, Bozarth added a handwritten note that he was "[r]eserving the rights to appeal prior court rulings and pursue legal remedies in civil court." Bozarth now appeals.

ISSUES AND STANDARDS OF REVIEW

¶19 Bozarth, through appellate counsel, raises three grounds for reversal. First, he argues that the district court erred in denying his motion to suppress. The "decision to grant or deny a motion to suppress for an alleged Fourth Amendment violation" comprises a mixed question of law and fact. *State v. Mikkelson*, 2016 UT App 136, ¶ 5, 379 P.3d 54 (cleaned up). We review the district court's factual findings for clear error and its legal conclusions for correctness, affording no deference to the district court's application of law to the facts "[b]ecause this case

involves a search and seizure." *State v. Alverez*, 2005 UT App 145, ¶ 8, 111 P.3d 808, *aff'd*, 2006 UT 61, ¶ 8, 147 P.3d 425.

¶20    Second, Bozarth argues that standby counsel rendered ineffective assistance by filing the memorandum in support of his motion to suppress nearly four months late. The State contends that this claim is not properly before this court because it falls outside the contours of Bozarth's conditional guilty plea. We evaluate this issue as a question of law because it is "raised for the first time on appeal" with "no lower court ruling to review." *See Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587.

¶21    Third, Bozarth argues he did not knowingly and intelligently waive his right to counsel and thus, the district court erred in allowing him to represent himself. Whether Bozarth's waiver was knowing and intelligent involves a mixed question of law and fact "which we review for correctness, but with a reasonable measure of discretion given to the [district] court's application of the facts to the law." *See State v. Valencia*, 2001 UT App 159, ¶ 11, 27 P.3d 573 (cleaned up).

ANALYSIS

I. Motion to Suppress

¶22    Bozarth first challenges the district court's denial of his motion to suppress the evidence police seized during the search of his bedroom. In particular, Bozarth contends the court's denial of the motion should be reversed because (1) "the officers did not have reasonable suspicion" to conduct a warrantless search of his bedroom, and (2) "mother did not have authority to consent to a search of [Bozarth's] private room." But the district court denied Bozarth's motion to suppress on three independent grounds, and "failure to challenge one of the district court's independent grounds leaves us with no basis for reversal and

thus no choice except to affirm." *See State v. Rigby*, 433 P.3d 803, 803 (Utah 2018) (cleaned up).

¶23　Bozarth's motion to suppress was first denied on the ground that a suspicionless search was proper under the terms of his parole agreement. The court found that Bozarth was on parole and subject to an agreement authorizing law enforcement to execute warrantless searches "with or without cause" so long as police obtained "prior approval from a parole officer." (Quoting Utah Code Ann. § 77-23-301.) The court further found that Bozarth had signed the parole agreement and thereby consented to its search and seizure provisions. Finally, the court concluded that the parole officer had instructed the police to search Bozarth's bedroom and that the police had complied with the parole agreement in conducting the search.

¶24　On appeal, Bozarth fails to challenge the main basis for denial—the propriety of the search under his parole agreement. Bozarth's opening brief addresses only the district court's two alternative bases for denying the motion to suppress. And at oral argument, Bozarth provided no response when directly asked whether the search was proper under the parole agreement.

¶25　"Our rules of appellate procedure place the burden on the appellant to identify and brief any asserted grounds for reversal of the decision below." *Kendall v. Olsen*, 2017 UT 38, ¶ 12, 424 P.3d 12 (citing Utah R. App. P. 24(a)(5), (9)). Where an appellant fails to challenge each independent basis for the district court's ruling, we affirm without reaching the merits of the decision. *Id.* ¶ 9; *see also In re J.M.*, 2020 UT App 52, ¶ 30, 463 P.3d 66 ("We will not reverse a ruling of a lower court that rests on independent alternative grounds where the appellant challenges less than all of those grounds." (cleaned up)). The circumstances here dictate that result.

¶26　But even were we to construe Bozarth's arguments as claiming that a search predicated on the parole agreement

requires reasonable suspicion, his arguments would still fail. "[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson v. California*, 547 U.S. 843, 857 (2006). "[P]arolees . . . have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852. A search conducted under the terms of a "clear and unambiguous search condition" within a parole agreement does not violate the Constitution. *See id.* at 846, 852. Here, Bozarth's parole agreement contained a search clause that authorized law enforcement to search and seize property from his residence after obtaining approval from a parole officer. The district court found that Bozarth had signed the parole agreement and consented to the search clause, and that the police had initiated the search after being instructed to do so by the parole officer. Under the circumstances presented here, we find no merit in the notion that the police needed reasonable suspicion to search Bozarth's bedroom. Therefore, we affirm the district court's denial of the motion to suppress.

## II. Ineffective Assistance of Standby Counsel

¶27　Bozarth next contends that standby counsel rendered constitutionally ineffective assistance by filing the memorandum in support of the motion to suppress several months late. The State asserts that this claim is not properly before us because it was not expressly reserved for appeal as part of Bozarth's conditional plea. We agree.

¶28　Bozarth argues that this issue was preserved because he raised it before the district court when he complained about standby counsel's performance, including the tardy filing of the memorandum. Bozarth further argues that, even if he did not preserve the issue by raising it in a manner to allow the court to rule on it, "ineffective assistance claims are not subject to the preservation rule." (Citing *State v. Weaver*, 2005 UT 49, ¶ 18, 122 P.3d 566.) But Bozarth misunderstands the State's argument. The

question is not whether Bozarth *preserved* the issue for appellate review by raising it below or whether an exception to the preservation rule applies. The question is whether Bozarth waived the issue by entering into a plea that was not conditioned on his right to appeal that specific issue.

¶29    "The general rule applicable in criminal proceedings, and the cases are legion, is that by pleading guilty, the defendant is deemed to have admitted all of the essential elements of the crime charged and thereby waives all nonjurisdictional defects, including alleged pre-plea constitutional violations." *State v. Rhinehart*, 2007 UT 61, ¶ 15, 167 P.3d 1046. "This general rule regarding forfeiture of appellate review . . . applies with equal force to a defendant who enters an unconditional no contest plea." *State v. Sery*, 758 P.2d 935, 938 (Utah Ct. App. 1988). A "plea acts as a waiver of earlier procedural flaws," except where the "errors affect the court's jurisdiction or where claims of error are expressly preserved for appeal." *Rhinehart*, 2007 UT 61, ¶ 15.

¶30    A defendant may expressly reserve a non-jurisdictional claim of error for appeal by entering a conditional plea pursuant to rule 11(j) of the Utah Rules of Criminal Procedure. *See Sery*, 758 P.2d at 939. Rule 11(j) allows for appellate review of non-jurisdictional, pre-plea issues only if three requirements are met: (1) the court must approve the conditional plea, (2) the prosecution must consent to the conditional plea, and (3) the conditional plea must identify "the adverse determination of any specified pre-trial motion" that is being reserved for appellate review. Utah R. Crim. P. 11(j); *see State v. Staats*, 2002 UT App 341U, para. 2 (per curiam). "A defendant seeking appellate review pursuant to a conditional plea bears the burden of demonstrating that the conditional nature of the plea is unambiguously established in the trial court record." *State v. Bobo*, 803 P.2d 1268, 1271 (Utah Ct. App. 1990).

¶31 In this case, Bozarth entered into a conditional plea of no contest "[r]eserving the rights to appeal prior court rulings." Although the conditional plea did not identify any specific pre-trial rulings reserved for appellate review, the State has not contested Bozarth's right to appeal the district court's denial of his motion to suppress. But there was no prior court ruling of any kind on Bozarth's ineffective assistance of counsel claim. Bozarth voiced various complaints regarding standby counsel's performance prior to the entry of his plea, but never filed a pre-trial motion seeking relief on that basis. As a result, the district court made no pre-trial ruling that could be reviewed on appeal pursuant to Bozarth's conditional plea.

¶32 Bozarth argues that his conditional plea was not limited to the right to appeal "prior court rulings" because he informed the court that he wished to reserve "all those objections that I made," including his complaints of "ineffective assistance of counsel." But under rule 11(j), a defendant who enters a conditional plea is limited to reserving the right to appeal "the adverse determination of any specified pre-trial motion." Rule 11(j) does not allow a defendant to enter a plea reserving the right to appeal issues on which there has been no pre-trial motion and, consequently, no adverse determination on such a motion. Because a plea waives all non-jurisdictional issues except those expressly reserved for appeal in accordance with rule 11(j), Bozarth is procedurally barred from raising his ineffective assistance of counsel claim.

### III. Waiver of Right to Counsel

¶33 Lastly, Bozarth argues that he did not knowingly and intelligently waive his right to counsel. "Under both the United States and Utah Constitutions, a criminal defendant has the right to assistance of counsel." *State v. Smith*, 2018 UT App 28, ¶ 16, 414 P.3d 1092 (cleaned up). Implicit in the right to counsel is a defendant's right to forgo the assistance of counsel and instead

exercise the right to self-representation. *State v. Pedockie*, 2006 UT 28, ¶ 26, 137 P.3d 716. Relinquishment of the right to counsel may occur in three ways: true waiver, implied waiver, or forfeiture. *Smith*, 2018 UT App 28, ¶ 17. At issue here is true waiver.

¶34   True waiver occurs when a defendant directly communicates a desire to proceed pro se. *Pedockie*, 2006 UT 28, ¶ 28. To be a valid true waiver, the defendant must (1) "clearly and unequivocally request self-representation" and (2) "act[] knowingly and intelligently, being aware of the dangers inherent in self-representation." *Id.* ¶¶ 28–29 (cleaned up). Bozarth asserts that his purported waiver fails on both accounts; namely, he claims that he did not clearly request to represent himself and did not act knowingly and intelligently. We address each argument in turn.

A.   Clear and Unequivocal Request for Self-Representation

¶35   First, Bozarth asserts that his communication to the court was "confusing" and did not clearly and unequivocally request self-representation. "To invoke the right of self-representation, a defendant must . . . make an explicit request" that clearly communicates an intention to waive the right to counsel. *See State v. Bakalov*, 1999 UT 45, ¶ 16, 979 P.2d 799 (cleaned up). This requirement ensures a defendant does not "unthinkingly waive the right to counsel through sporadic musings" and also prevents a defendant from mischaracterizing the statements he made to the district court when the case is reviewed on appeal. *Id.* "If a defendant equivocates in his request to represent himself, he is presumed to have requested the assistance of counsel." *Id.*

¶36   When Bozarth waived his right to counsel he explicitly stated, "I do not [want counsel]. I want to represent myself." After the court acknowledged Bozarth's request, he then stated, "I would like assistance of counsel. Assistance." Bozarth argues

on appeal that his request for "assistance" represents an equivocation in his intentions regarding self-representation. We disagree.

¶37   In context, Bozarth's statement that he "would like assistance of counsel" was a request to have standby counsel present in a supporting role, supplementing Bozarth's efforts to represent himself. After requesting "assistance of counsel," Bozarth went on to explain what "assistance" meant—providing him with the legal materials so he could "study" and "have knowledge" about the law to "write proper meaningful papers to the court." On multiple occasions throughout the proceedings, Bozarth reiterated that he wanted to represent himself with standby counsel's role limited to providing legal advice only when requested. And Bozarth's behavior unequivocally indicated that he had elected to represent himself: Bozarth requested legal materials and discovery; he filed numerous motions, a request to submit, and other court documents; he expressed his desire to take the lead in hearings, and did so by asking questions, lodging objections, and invoking procedural rules; and he made important decisions regarding scheduling and plea deals.

¶38   Admittedly, Bozarth requested standby counsel's assistance in providing legal points and authority in support of his motion to suppress. In making this request Bozarth stated, "I said in court I will speak for myself because I am very concerned that [standby counsel] will not ask the questions that need to be asked." But Bozarth wanted standby counsel's help with the motion to suppress because, according to Bozarth, "[h]e's still my assistance of counsel." This request does not represent equivocation in Bozarth's intention to represent himself. Indeed, it merely reinforces what Bozarth communicated explicitly and implicitly throughout his proceedings—that he desired to represent himself with limited support from standby counsel when requested. We therefore conclude that Bozarth clearly and

unequivocally communicated, through an explicit request to the court, that he intended to waive his right to counsel.

B.      Knowing and Intelligent Waiver

¶39    Next, Bozarth argues that he did not knowingly waive his right to counsel. There exists a "fundamental right to counsel" and a "strong presumption against waiver" of that right, and "any doubts [regarding the validity of the waiver] must be resolved in favor of the defendant." *State v. Pedockie*, 2006 UT 28, ¶ 45, 137 P.3d 716. But where a defendant "expressly decline[s] an offer of counsel by the trial judge, he has the burden of showing by a preponderance of the evidence that he did not [knowingly and intelligently] waive this right." *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987). Because we have concluded that Bozarth expressly and unequivocally waived his right to counsel, we now turn to whether he has carried his burden to show that the waiver was not "knowingly and intelligently" made. To this end, Bozarth raises three arguments.

¶40    First, Bozarth claims that the waiver was not knowing and intelligent because the district court failed to conduct an on-the-record colloquy explaining the risks of self-representation. In *State v. Frampton*, 737 P.2d 183, 187 n.12 (Utah 1987), the Utah Supreme Court articulated a sixteen-point colloquy designed to ensure that defendants "are aware of the dangers and disadvantages of self-representation." *Pedockie*, 2006 UT 28, ¶ 40. Conducting this on-the-record colloquy is the best way to ensure that a defendant has knowingly and intelligently waived the right to counsel and "provides the reviewing court with an objective basis for review upon the almost inevitable challenge to the waiver by the defendant who proceeds pro se and is subsequently convicted." *Id.* ¶ 42. Because no such colloquy occurred in this case, Bozarth argues that he did not knowingly and intelligently waive his constitutional right to counsel.

¶41 But while the *Frampton* colloquy is encouraged and can constitute something of a safe harbor for district courts confronting a waiver-of-counsel issue, the colloquy is not mandatory. *State v. Waterfield*, 2014 UT App 67, ¶ 20, 322 P.3d 1194 (explaining that the sixteen-point colloquy articulated in *Frampton* provides "guidance" to district courts when evaluating a waiver of counsel but "is not mandatory and its phrasing not talismanic"). It is possible—although perhaps rare, *see Pedockie*, 2006 UT 28, ¶ 45[1]—for a defendant to knowingly and intelligently waive the right to counsel without a *Frampton*

---

1. We perceive some tension between the analysis contemplated by *Pedockie* and the rule that a defendant who expressly waives his right to counsel bears the burden of proving that the waiver was not knowing and intelligent. In instructing reviewing courts to undertake a de novo review of the record, our supreme court in *Pedockie* noted "that, considering the strong presumption against waiver and the fundamental nature of the right to counsel, any doubts must be resolved in favor of the defendant," and the court "anticipate[d] that reviewing courts will rarely find a valid waiver of the right to counsel absent a colloquy." *State v. Pedockie*, 2006 UT 28, ¶ 45, 137 P.3d 716 (cleaned up). However, *Pedockie* did not involve an express waiver of the right to counsel and did not purport to overrule *Frampton*'s pronouncement, based on United States Supreme Court case law, that the defendant in such cases bears "the burden of showing by a preponderance of the evidence that he did not [knowingly and intelligently] waive this right." *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (citing *Moore v. Michigan*, 355 U.S. 155, 161–62 (1957) (holding that "the petitioner had the burden of showing, by a preponderance of the evidence, that he did not intelligently and understandingly waive his right to counsel")). At the very least, we do not read *Pedockie* to suggest that a district court's failure to conduct a non-mandatory colloquy relieves the appellant of his burden of persuasion on appeal.

colloquy. In the absence of such a colloquy, a reviewing court "will look at any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se." *Frampton*, 737 P.2d at 188. To determine "whether the defendant understood the consequences of waiver," the reviewing court must conduct a de novo review of the record to "analyze the particular facts and circumstances surrounding" the case. *Pedockie*, 2006 UT 28, ¶ 45 (cleaned up).

¶42 Here, the record demonstrates that Bozarth understood the value of counsel and was well aware of the risks of proceeding pro se. At the time of the waiver, Bozarth's appointed counsel informed the court that he had explained Bozarth's "options," that Bozarth was "cognizant of what his rights are," and that Bozarth was "well versed," "educated," and "knows the law to some degree." Bozarth confirmed that he wanted to represent himself, but he also requested "assistance of counsel" in obtaining the relevant law. Bozarth explained, "I am entitled to all the laws, because all the laws are applied to me. I am entitled to read them, study them, have knowledge[,] be able to write proper meaningful papers to the court." Bozarth acknowledged that legal rules are complicated and recognized that representing himself without the assistance of standby counsel would be like "trying to work on a vehicle" without "any kind of instruction whatsoever." Nonetheless, he repeatedly reaffirmed his desire to represent himself with standby counsel providing assistance only when requested.

¶43 Admittedly, we "will rarely find a valid waiver of the right to counsel absent a colloquy," *Pedockie*, 2006 UT 28, ¶ 45, yet our supreme court found a valid waiver in *Frampton* on a similar record. In that case, the court held that Frampton validly waived his right to counsel, even without a colloquy, because the record showed an actual awareness of the risks of proceeding pro se. *See Frampton*, 737 P.2d at 188–89. Frampton knew he was entitled to "appointed counsel if he could show that he was

indigent," "knew that the judge insisted upon having counsel present," and had been previously tried twice on the same charges so that the "value of counsel should have been apparent" to him. *Id.* Frampton "spoke to the jurors about the statute under which he was charged," and was afforded "every courtesy" by the judge who explained "applicable procedures" and gave the "defendant extremely wide latitude in conducting his defense." *Id.* And Frampton was present when "the judge explained the charges in open court," and therefore "knew he faced a felony charge and was aware of the penalty he could be subjected to if found guilty." *Id.*

¶44    Here, the record demonstrates that Bozarth likewise understood his right to counsel and the risks of proceeding pro se. At the initial hearing, Bozarth had already prepared a request for counsel and knew enough to reserve his right to self-representation should he later desire "to retake the helm" of his case. Prior to requesting that he represent himself, Bozarth was aware of the value of counsel because the court explained counsel's role and Bozarth solicited standby counsel's assistance with certain tasks. Bozarth demonstrated his knowledge of court procedures by requesting materials to properly file documents, declaring his intention to file a motion to suppress, and confirming that he was aware of the procedural requirements when he elected to self-represent. Finally, the court had also informed Bozarth of his charges and possible penalties. Bozarth does not address this evidence nor does he point to anything in the record to distinguish this case from *Frampton*. Under these circumstances, Bozarth has not carried his burden to show that he did not knowingly and intelligently waive his right to counsel. *See id.*

¶45    Second, Bozarth argues that standby counsel's limited role was never clearly defined and without understanding what support standby counsel would be able to provide, he could not have knowingly and intelligently consented to waive his right to

counsel. Because no colloquy exists on the record, we must look at "any evidence in the record which shows [Bozarth's] actual awareness" of his obligations as a pro se defendant, and what assistance standby counsel could provide. *See id.* at 188; *see also State v. Rohwedder*, 2018 UT App 182, ¶ 21, 436 P.3d 324 (Mortensen, J., concurring) (urging district courts to engage in a colloquy with pro se defendants when appointing standby counsel to avoid any confusion that may arise "when the function and role of standby counsel is not clear").

¶46   The record is replete with evidence indicating that Bozarth understood his role along with the limited role of standby counsel. Once Bozarth indicated that he wanted to represent himself, the court instructed him on the process for court filings, reminding him that he was responsible for filings since he was representing himself. Thereafter, Bozarth filed numerous court documents.

¶47   At the next hearing, standby counsel expressed concern that Bozarth did not understand the limited role standby counsel was to play because he was asking for assistance with civil matters. The court then took the time to explain both Bozarth's and standby counsel's roles. As part of self-representation, the court indicated that Bozarth would be required to conduct opening and closing arguments, ask questions of witnesses, and run hearings and the trial because standby counsel would not be taking on that role. After this explanation, the court confirmed that this was Bozarth's understanding at the time he elected to proceed pro se. The court noted, "I thought the last time you appeared [standby counsel] was going to be . . . here in case you need assistance, but you are the one that's, basically, you know, representing yourself." Bozarth responded, "Correct. And that's what I had the impression of also." Bozarth unambiguously indicated that he understood his waiver of counsel to mean he primarily would shoulder the responsibility for his defense with standby counsel limited to assisting Bozarth as needed; simply

put, Bozarth clearly stated that he understood the implications of the arrangement to which he had agreed.

¶48   Similarly, at the hearing on the motion to suppress, the court again explained to Bozarth the process and timeline for filing post-hearing briefs, and then described the procedure for the evidentiary hearing and the rules Bozarth would be required to follow. Bozarth proceeded to manage the hearing—almost entirely on his own—by asking questions, lodging objections, and complying with the rules of evidence. The record demonstrates that Bozarth was informed of his responsibilities as a pro se defendant and standby counsel's limited role, and his behavior indicated that he clearly understood those responsibilities.

¶49   Third, Bozarth argues that he did not competently represent himself, apparently in an attempt to undermine the validity of his waiver. But district courts must respect defendants' constitutional right to proceed pro se so long as they knowingly and intelligently waive their right to assistance of counsel. *Rohwedder*, 2018 UT App 182, ¶ 15 (majority opinion). While "the choice of self-representation often results in detrimental consequences to the defendant," the defendant "cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel." *Id.* (cleaned up).

¶50   Bozarth has not pointed to any evidence indicating his waiver was invalid. Thus, because Bozarth validly waived counsel, the district court had a duty to allow Bozarth to exercise his right to self-representation. *See id.*; *see also Pedockie*, 2006 UT 28, ¶ 26. Any complaints regarding his performance representing himself are part and parcel of the risks associated with that choice and do not undermine the validity of his waiver.

CONCLUSION

¶51   We dismiss Bozarth's ineffective assistance of counsel claim because it is not properly before us. As to Bozarth's other claims, Bozarth has failed to carry his burden of demonstrating error in the district court's decisions to deny the motion to suppress and to allow Bozarth to exercise his right to self-representation. Therefore, we affirm.

———————