2022 UT App 16

# THE UTAH COURT OF APPEALS

PROVO CITY,
Appellee,
*v.*
MELVIN BILL BISHOP-GARCIA,
Appellant.

Opinion
No. 20190872-CA
Filed February 3, 2022

Fourth District Court, Provo Department
The Honorable Donald J. Eyre
No. 171404066

Emily Adams, Freyja Johnson, and Cherise M.
Bacalski, Attorneys for Appellant

J. Brian Jones, Stephen H. Schreiner, and Matthew M.
Griffiths, Attorneys for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES JILL
M. POHLMAN and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1　Our evidentiary rules prohibit "testimony as to a witness's truthfulness on a particular occasion." *State v. Boyer*, 2020 UT App 23, ¶ 44, 460 P.3d 569 (cleaned up). In this case, Appellant Melvin Bishop-Garcia argues that he did not receive constitutionally effective assistance of counsel at trial because his attorney failed to object to such inadmissible testimony. We agree, vacate Bishop-Garcia's convictions for unlawful detention and sexual battery, and remand for a new trial.

BACKGROUND

¶2    The alleged crimes occurred at Bishop-Garcia's home in Provo, Utah—a duplex located next door to the restaurant where his wife worked. The duplex had an external entrance leading to the basement, where the restaurant's owner—also Bishop-Garcia's landlord—stored ice for the restaurant's soda machine. Every morning, restaurant employees would go to the basement to retrieve ice for the machine.

¶3    The owner's family friend, Laura,[1] worked at the restaurant with Bishop-Garcia's wife. One morning, it was Laura's turn to open the restaurant. After unlocking the doors, she went next door to the duplex, retrieved buckets of ice from the basement, then crossed the backyard on her way back to the restaurant. At this point, Bishop-Garcia emerged from the back door of the house and called to Laura, offering to help.

¶4    As for what happened next, the two provided conflicting accounts at trial. Laura testified that she declined the offer but that Bishop-Garcia invited her inside on the pretense that his wife wanted to speak with her. Thinking that the conversation would only last a moment, Laura followed Bishop-Garcia inside—ice buckets in hand—and waited near the back door while Bishop-Garcia called for his wife (who was not home). As they waited, Bishop-Garcia moved directly behind Laura and began "telling [her] that [she] looked pretty, and that [she] had lost weight." He then grabbed her breast and buttocks.

¶5    Laura immediately turned to leave and, following a brief struggle at the door, managed to get outside. Bishop-Garcia chased after Laura, wrapped his arms around her from behind, and tried to kiss her on the cheek. Once again, Laura broke free and fled to the restaurant, where she locked the back door and

---

1. A pseudonym.

called the owner. Moments later, Bishop-Garcia entered through the front door, found Laura, and insisted that she "not . . . call the police because he was afraid of losing everything." Laura testified that Bishop-Garcia remained "very persistent" until the owner arrived, at which point Bishop-Garcia exited the restaurant and met the owner outside.

¶6     Bishop-Garcia told a different story. He testified that Laura had accepted his help and that the two briefly embraced before going inside to talk "[a]bout anything." Once inside, Bishop-Garcia told Laura that his wife was not home, after which Laura "changed her demeanor" and quickly returned to the restaurant. "In [Bishop-Garcia's] mind," he "was still helping" Laura, so he followed her there. He could tell that something was bothering Laura, so even when she locked the back door, Bishop-Garcia entered through the front and attempted to "calm her down." According to Bishop-Garcia, Laura inexplicably threatened to call the police, and Bishop-Garcia returned home until the owner showed up.

¶7     Both testified that the owner arrived, spoke with each of them, then called the police. The responding officer interviewed all three parties and decided to arrest Bishop-Garcia. Ultimately, Bishop-Garcia was charged with unlawful detention and sexual battery, and Laura, Bishop-Garcia, the owner, and the officer all testified at Bishop-Garcia's jury trial. This appeal primarily concerns the owner's and the officer's respective testimonies.

¶8     For his part, the owner testified about his conversation with Laura after arriving at the restaurant. The owner stated that Laura had been crying over the phone and that, when he arrived, Laura "was still upset." She told him that Bishop-Garcia had touched her inappropriately, so the owner "decided to call the police right away."

¶9     At trial, the prosecutor asked the owner, "Did you believe [Laura's] story?" The owner replied, "I did."

¶10 The officer also testified about his conversations with Laura that morning. The prosecutor asked the officer, "When you heard [Laura's] story, did it make sense to you?" The officer said, "It did." The prosecutor then asked, "Did you find [Laura] to be credible?" The officer replied, "Yes." The officer explained that he believed Laura because "[h]er story was consistent" each time he asked her to recount it.

¶11 Later, the officer testified about his interactions with Bishop-Garcia that same morning. The prosecutor asked, "What were some of the factors that went into your determination to arrest the defendant?" The officer responded, "[T]he credibility that I felt with [Laura's] statement being a consistent statement, not changing. The inconsistencies in [Bishop-Garcia's] statement[s] . . . ."

¶12 At no point did defense counsel object to the foregoing portions of testimony.

¶13 During closing arguments, the prosecutor framed the case as "a he-said, she-said case . . . [b]ecause there were only two people in the house and there were only two people that were there witnessing [the] conduct." Near the end of rebuttal closing argument, the prosecutor said,

> [Laura] was telling a true story. [The owner] believed her and the [officer] believed her . . . . It doesn't matter if they believed her; it matters if you believed her. But the fact that they believed her and the fact that they testified that she was so emotional, that should lead you to consider, do you agree with . . . their assessment or do you not?

¶14 The jury found Bishop-Garcia guilty on both counts. Bishop-Garcia now appeals.

ISSUE AND STANDARD OF REVIEW

¶15 Bishop-Garcia contends that trial counsel rendered constitutionally ineffective assistance by failing to object when the prosecution's witnesses offered opinions about Laura's and Bishop-Garcia's truthfulness on the morning of the alleged crimes. "We evaluate this as a question of law because it is raised for the first time on appeal with no lower court ruling to review." *State v. Bozarth*, 2021 UT App 117, ¶ 20, 501 P.3d 116 (cleaned up).

ANALYSIS

¶16 "To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *State v. Calvert*, 2017 UT App 212, ¶ 21, 407 P.3d 1098 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We assess whether Bishop-Garcia received ineffective assistance within this framework.

I. Deficient Performance

¶17 To establish deficient performance, defendants "must show that trial counsel's 'representation fell below an objective standard of reasonableness' when measured against prevailing professional norms." *Honie v. State*, 2014 UT 19, ¶ 32, 342 P.3d 182 (quoting *Strickland*, 466 U.S. at 687–88). Defendants must "overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. 668, 689 (1984) (cleaned up). Even if there was no strategic reason for forgoing an objection, we must consider whether "correcting the [purported] error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871.

¶18 When analyzing deficient performance, we often begin by determining whether an error occurred that counsel failed to correct. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1021 ("[T]he failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance." (cleaned up)). Accordingly, here, we begin by assessing whether Bishop-Garcia has identified instances of inadmissible testimony to which counsel could have properly objected. Because we conclude that an objection was merited in each instance, we next determine whether doing so was "a battle that competent counsel would have fought." *See Ray*, 2020 UT 12, ¶ 32. Given that the challenged testimony concerns the central issue in this case, we conclude that it was objectively unreasonable for counsel not to object.

A. The Prosecution's Evidence Was Objectionable.

¶19 Bishop-Garcia identifies three instances of testimony he argues were inadmissible under rule 608(a) of the Utah Rules of Evidence: (1) the owner's statement that he believed Laura's story, (2) the officer's statement that he found Laura credible, and (3) the officer's explanation for why he decided to arrest Bishop-Garcia.[2] We agree that the prosecution elicited inadmissible testimony in each of the three instances.

---

2. Bishop-Garcia also challenges his convictions based on trial counsel's failure to object to statements the officer made regarding his method for assessing credibility, which Bishop-Garcia argues was impermissible expert testimony. *See State v. Rammel*, 721 P.2d 498, 500–01 (Utah 1986) (holding that detective's testimony about another witness's truthfulness "[b]ased on his experience interviewing several hundred criminal suspects" was inadmissible expert opinion); *State v. Valdez*, 2021 UT App 13, ¶ 55, 482 P.3d 861 (declaring improper

(continued…)

¶20   Under rule 608(a), "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness." Utah R. Evid. 608(a). The rule "permits testimony concerning a witness's general character or reputation for truthfulness or untruthfulness," *State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984, but "bars direct testimony regarding the truthfulness of a witness on a particular occasion," *State v. Adams*, 2000 UT 42, ¶ 14, 5 P.3d 642 (cleaned up). This ensures that credibility determinations remain "the exclusive province of the jury." *See State v. Lewis*, 2020 UT App 132, ¶ 21, 475 P.3d 956.

¶21   Here, the testimony that Bishop-Garcia has identified was inadmissible under rule 608(a) because, in each instance, the witness testified about another's truthfulness on a particular occasion. First, the prosecutor asked the owner whether he "believe[d] [Laura's] story" after speaking with Laura on the phone and at the restaurant. By responding affirmatively, the owner directly opined on Laura's truthfulness on those occasions. Second, the prosecutor similarly asked the officer whether he had found Laura "to be credible" when he interviewed her on scene. The officer said, "Yes." Like the owner, the officer thereby offered a direct opinion on whether Laura was being truthful with him on the specific occasion when she reported the alleged crimes.

---

(…continued)

an officer's testimony that he was "a sort of human lie detector"), *cert. granted*, 496 P.3d 715 (Utah 2021). But because we determine that Bishop-Garcia received ineffective assistance based on counsel's failure to object to other testimony, we need not reach the issue of whether counsel rendered ineffective assistance by failing to object to this additional testimony.

¶22    Finally, the officer testified that he arrested Bishop-Garcia based on a determination that Laura's statement was more credible than the statement that Bishop-Garcia provided. When asked why he arrested Bishop-Garcia, the officer explained that, unlike Laura's statement, which was "consistent" and "not changing," Bishop-Garcia's statement had "inconsistencies." Merely observing that a witness's statements are consistent does not necessarily amount to bolstering. *Compare Adams*, 2000 UT 42, ¶¶ 19–20 (holding that rule 608(a) barred testimony that victim's account was not only "consistent," but also did not appear coached), *and State v. Bragg*, 2013 UT App 282, ¶ 31, 317 P.3d 452 (holding that it was "obvious error" to admit testimony that the victim was not only "consistent" but also "genuine and did not appear to have been coached"), *with State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050 (holding that rule 608(a) permitted the witness's testimony that the victim's "trial testimony was consistent with the allegations she made during [a prior] interview"). Here, however, the officer did not merely state that Laura's account was consistent; he indicated that, after interviewing both Laura and Bishop-Garcia at the scene, he made the decision to arrest Bishop-Garcia based on his assessment of Bishop-Garcia's story relative to Laura's. Thus, in context, the officer gave "the equivalent of an affirmative statement that" Bishop-Garcia was being untruthful when he interviewed him that morning. *See Adams*, 2000 UT 42, ¶ 13. Therefore, we have no difficulty concluding that each instance of testimony merited an objection under rule 608(a).

B.    Trial Counsel's Failure to Object Constitutes Deficient Performance.

¶23    Under the circumstances of this case, trial counsel's failure to object to each instance of testimony that Bishop-Garcia has identified was objectively unreasonable. We reach that conclusion for several reasons.

¶24  First, the testimony at issue was obviously inadmissible. Our case law is rich with examples of rule 608(a) in action. *See State v. Jones*, 2020 UT App 161, ¶¶ 15–17, 478 P.3d 1055 (discussing cases). And we find it particularly persuasive that the admission of similar testimony has been held to constitute not just error, but plain error. In *State v. Hoyt*, 806 P.2d 204 (Utah Ct. App. 1991), for example, we held that the admission of expert testimony that a child sexual abuse victim was "truthful in her allegations" was plainly erroneous, violating a "time-honored principle of evidence." *Id.* at 210–11 (cleaned up). In *State v. Adams*, 955 P.2d 781 (Utah Ct. App. 1998), we concluded—and the State conceded on appeal—that a detective's testimony that he "did not believe [the victim] had been coached" obviously violated rule 608(a). *Id.* at 785–86. And in *State v. Cegers*, 2019 UT App 54, 440 P.3d 924, we held that a counselor's testimony that the victim would not have fabricated the sexual abuse allegations to get a scholarship was indistinguishable "from the impermissible bolstering we have previously deemed to be plainly inadmissible." *Id.* ¶ 30. Thus, it should have been apparent to counsel that the testimony was not merely inadmissible, but plainly so.

¶25  Second, counsel had ample opportunity to object and prevent the error. This was not a situation in which the owner and the officer spontaneously volunteered an inadmissible opinion, such that counsel had to weigh the "risk of drawing attention to unfavorable testimony" by objecting. *See State v. Tippets*, 2021 UT App 137, ¶ 29 (cleaned up). Instead, the prosecution overtly elicited each instance of inadmissible testimony. The prosecutor asked the owner, "Did you believe [Laura's] story?" Similarly, the prosecutor asked the officer, "Did you find [Laura] to be credible?" Those questions were obviously improper and should have prompted an immediate objection before the jury heard the inadmissible response. Reasonable counsel would have also anticipated that asking the officer about the factors that went into arresting Bishop-Garcia

would similarly call for inadmissible testimony about the relative credibility of Laura and Bishop-Garcia because, based on the nature of the alleged crimes, their respective statements were the only evidence on which the officer could have relied in determining that a crime had occurred.

¶26 Without disputing that the testimony was plainly inadmissible, Provo City suggests on appeal that objectively reasonable counsel could have nonetheless chosen not to object as a matter of trial strategy. Specifically, Provo City argues that "opinions about [Laura's] consistency and Bishop-Garcia's inconsistency" allowed counsel to "point out counterexamples" during closing arguments, including "possible inconsistencies in" Laura's trial testimony. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Where we can attribute "the challenged action" to "a sound trial strategy, it follows that counsel did not perform deficiently." *State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 (cleaned up).

¶27 But a purported strategy only justifies counsel's error if the strategy was reasonable; "[a]n objectively unreasonable trial strategy will not suffice." *State v. Ray*, 2020 UT 12, ¶ 34 n.7, 469 P.3d 871. The strategy suggested by Provo City relates only to the third instance, in which the officer testified that he arrested Bishop-Garcia because Laura's statement was consistent as compared to Bishop-Garcia's. Such a strategy does not explain why counsel did not object to the first two instances in which witnesses were asked directly whether they believed Laura. Moreover, to cast doubt on Laura's credibility, it was not necessary to allow the officer to offer his opinion that Laura's story was more consistent than Bishop-Garcia's. Even if the inadmissible testimony was excluded, trial counsel was still free to point out alleged inconsistencies in Laura's statement, both on Laura's cross-examination and in closing argument. Allowing

the officer's plainly inadmissible opinion on the parties' relative credibility gained nothing for the defense and was not part of a reasonable strategy.

¶28 Finally, the issue "was sufficiently important under the circumstances that counsel's failure to" object was objectively unreasonable. *See id.* ¶ 32. The testimony concerned the central issue in the case: Laura's credibility versus Bishop-Garcia's. As the prosecutor acknowledged in closing argument, this was a "he-said, she-said case." There was no corroborating evidence of the alleged crimes. There were no other witnesses and no physical evidence. Under such circumstances, it was objectively unreasonable for trial counsel to voice no objection to testimony regarding whether Laura or Bishop-Garcia had been truthful on the morning of the alleged crimes.

¶29 In sum, the testimony at issue was obviously inadmissible under well-established law and forecasted by plainly objectionable questions posed by the prosecution. We cannot conceive of a reasonable trial strategy to account for counsel's failure to object on each occasion. Provo City suggests that the admission of the testimony allowed the defense to poke holes in Laura's story, but that strategy was not furthered by—much less dependent on—the admission of the improper testimony. And because it was objectively unreasonable not to object to improper bolstering where the case hinged entirely on relative credibility, we determine that counsel rendered deficient performance.

## II. Prejudice

¶30 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Rather, the defendant must also "demonstrate a reasonable probability that the outcome of his or her case would have been different absent counsel's error." *State v. Scott*, 2020 UT 13, ¶ 43, 462 P.3d 350.

Here, we ask whether there is a reasonable probability that the jury would not have convicted Bishop-Garcia, absent the inadmissible testimony.

¶31 Bishop-Garcia frames this case as a "credibility contest," in which the key issue before the jury was whether it believed Laura over Bishop-Garcia. (Quoting *State v. J.A.L.*, 2011 UT 27, ¶ 41, 262 P.3d 1.) In Bishop-Garcia's view, had the inadmissible testimony been excluded, "there is a reasonable probability that the jury would have found in [his] favor."

¶32 Provo City disagrees with Bishop-Garcia's characterization of the case, arguing that "a great deal of additional evidence supported the jury's verdict." Provo City points to undisputed testimony that Bishop-Garcia's wife was not home when Bishop-Garcia invited Laura inside, that Laura took the ice buckets inside, that Bishop-Garcia complimented Laura on her looks, and that Bishop-Garcia closed the door behind her. It also directs us to instances where Bishop-Garcia "contradicted himself," and to evidence of how emotional Laura appeared on the morning of the alleged crimes. But none of this evidence, alone or in combination, supports that a crime occurred. "In this case, there was no confession, no third-party eyewitnesses, and no physical evidence that [Laura] had been sexually abused; the only direct evidence that abuse occurred was [Laura's] testimony." *See State v. Burnett*, 2018 UT App 80, ¶ 39, 427 P.3d 288.

¶33 If believed, Laura's testimony, standing alone, is unquestionably enough to support the jury's verdict. And it is clear that, in returning a guilty verdict, the jury did believe Laura's testimony. But there is a reasonable probability that the jury might have reached a different conclusion but for the inadmissible testimony. The jury, tasked with determining which person was telling the truth, heard testimony that both the owner, who knew Laura personally, and the officer, who

claimed to have specialized training and experience assessing credibility, believed Laura's story. It may be that the jury would have believed Laura's testimony even without the improper bolstering, but given the importance of the credibility determination and the absence of corroborating evidence, the error undermines our confidence in the verdict.[3]

¶34    We are particularly troubled by the fact that the prosecution relied heavily on the inadmissible testimony during closing arguments. In rebuttal, the prosecutor emphasized that both the owner and the officer believed Laura's side of the story. And despite advising the jury that "[i]t doesn't matter if they believed her," the prosecutor immediately doubled-back. The prosecutor closed the argument by saying, "[T]he fact that [the owner and the officer] believed her and the fact that they testified that she was so emotional, that should lead you to consider, do you agree with . . . their assessment or do you not?" The emphasis placed on the impermissible testimony in the prosecutor's final words to the jury further undermines our confidence in the outcome.

¶35    Nonetheless, Provo City argues that the inadmissible testimony was harmless because "it was quite obvious under the

---

3. Because sex crimes often lack corroborative evidence and "hinge[] on [the jury's] assessment of the victims' credibility" over that of defendants, bolstering errors are more likely to be prejudicial in such cases. *See State v. Cegers*, 2019 UT App 54, ¶ 37, 440 P.3d 924; *see, e.g.*, *id.*; *State v. Stefaniak*, 900 P.2d 1094 (Utah Ct. App. 1995); *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990). We are mindful that a trial on allegations of sexual abuse can be deeply traumatic for victims and defendants, and no less the second time around. It is therefore incumbent on prosecutors not to elicit such testimony at trial—and on defense counsel to object when it occurs—to avoid necessitating retrial.

circumstances what [the owner and the officer] believed, even without their direct testimony confirming it." It asserts that the owner was a friend of Laura's and, therefore, was inevitably going to believe her; and the fact that the officer decided to arrest Bishop-Garcia implicitly suggested that he credited Laura's story over Bishop-Garcia's. Where it would have been obvious to the jury that the testifying witness believed the other witness's story, we have sometimes found no prejudice when incidental bolstering testimony is offered by a lay witness. *See, e.g., State v. King*, 2010 UT App 396, ¶ 46, 248 P.3d 984 (holding that "any incidental bolstering by the grandmother was harmless" where "it would come as no real surprise to the jury that she believed her granddaughter"); *State v. Nunes*, 2020 UT App 145, ¶ 23, 476 P.3d 172 ("Given the incidental nature of the challenged statement and the fact that most jurors are likely to assume that a mother will believe accusations of sexual abuse made by her own children, we cannot conclude that the challenged portion of Mother's testimony had any significant impact on the jury's decision to convict . . . ." (cleaned up)). But here the testimony was not incidental. Both the owner and the officer were directly asked to opine on Laura's credibility, and that testimony was subsequently highlighted in the prosecution's closing argument. In addition, by asking the officer to explain why he had arrested Bishop-Garcia, the prosecution elicited a comparison between the truthfulness of Laura's and Bishop-Garcia's statements. That testimony followed a description of the officer's training and his methods for assessing credibility. The patina of expert testimony further distinguishes the officer's inadmissible testimony from the type of off-hand remark by a family member that this court has deemed to be harmless. *See, e.g., King*, 2010 UT App 396, ¶ 46; *Nunes*, 2020 UT App 145, ¶ 23.

¶36 Provo City further argues that several of the jury instructions cured the harm caused by the inadmissible testimony. We find nothing in these instructions directing the jury to set aside the owner's or the officer's objectionable

statements. On the contrary, the instructions encouraged the jury to consider each witness's testimony and to give that testimony whatever weight it believed it deserved. And although the jury was instructed not to give the testimony of law enforcement undue weight, the jury was never instructed to disregard the officer's inadmissible testimony assessing the truthfulness of Laura's and Bishop-Garcia's statements.

¶37 Given the prominence of the inadmissible testimony and the importance of credibility in this case, Bishop-Garcia has demonstrated a reasonable probability of a different outcome if counsel had prevented the error. *See State v. Knight*, 734 P.2d 913, 920 (Utah 1987) ("[C]onfidence in the outcome may be undermined at some point substantially short of the 'more probable than not' portion of the spectrum."). Therefore, he is entitled to a new trial.

CONCLUSION

¶38 We conclude that the prosecution's witnesses offered inadmissible testimony regarding Laura's and Bishop-Garcia's truthfulness on the morning of the alleged crimes. Because this case hinged on whether the jury believed Laura versus Bishop-Garcia, trial counsel rendered deficient performance by failing to object to such testimony and counsel's failure prejudiced Bishop-Garcia's defense. Therefore, we hold that Bishop-Garcia received ineffective assistance of counsel, vacate his convictions, and remand for a new trial.

———————