2025 UT App 75

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JIMMY JOSEPH HAYNES,
Appellant.

Opinion
No. 20220420-CA
Filed May 22, 2025

Third District Court, Salt Lake Department
The Honorable Matthew Bates
No. 201912835

Andrea J. Garland and Brock Van De Kamp,
Attorneys for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

OLIVER, Judge:

¶1      A jury convicted Jimmy Joseph Haynes on one count of rape of a child, three counts of aggravated sexual abuse of a child, and one count of sodomy upon a child. Haynes appeals his convictions, asserting that the trial court erred in denying his motions to dismiss and that his trial attorneys (Counsel) rendered constitutionally ineffective assistance. In connection with his ineffective assistance claims, Haynes filed a motion requesting a remand under rule 23B of the Utah Rules of Appellate Procedure for entry of factual findings necessary to establish his claims. We reject Haynes's claims of error by the trial court and of ineffective assistance that are based on the record. We also determine that Haynes has not met his burden under rule 23B on the ineffective

assistance claims for which he requests a remand. Accordingly, we affirm Haynes's convictions.

BACKGROUND[1]

*The Abuse*

¶2     In 2004, eleven-year-old Emma moved from California to Utah to live with Haynes—who was a friend of Emma's late father—and his wife, Ashley.[2] Initially, Emma's relationship with Haynes was positive, and she began calling him "dad."[3] Eventually, however, Haynes began "tickling" Emma underneath her bra and underwear. Emma initially "just brushed it off" and tried to "assume[] that it was an accident." When Emma would "try to tickle back," Haynes would challenge her to "find out where he's ticklish at."

¶3     One morning in August 2007, just before Emma's fourteenth birthday, Haynes and Emma were alone in the house. Haynes, wearing only a towel around his waist, came into Emma's bedroom and woke her up. He told her to come into his bedroom, and Emma, thinking she was in trouble because Haynes "came off kind of aggressive," did as she was told. By the time

---

1. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly," and "we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Speights*, 2021 UT 56, n.1, 497 P.3d 340 (cleaned up).

2. Emma and Ashley are both pseudonyms.

3. While Haynes and Ashley were not Emma's biological or adoptive parents, Emma regarded them as her parents and called them "dad" and "mom."

Emma entered his bedroom, Haynes had taken off the towel and was getting under the sheets. He told her to get into bed with him, and as she did, he said he would show her where he was ticklish and grabbed her hand, putting it on his penis. Haynes moved her hand over his penis, then pulled up Emma's tank top and bra and began sucking on her breasts. Emma was "nervous" and "just did whatever he told" her, biting one of her fingers so she would not cry. Next, Haynes pulled her pajama shorts and underwear down around her legs and began licking her vagina. Haynes then penetrated Emma's vagina with his finger. Kicking her shorts and underwear all the way off her, Haynes climbed on top of Emma and penetrated her vagina with his penis. When he finished, he told her to go back to bed. Before Haynes left for work, he came into her bedroom, asking if she had any birthday money left, and gave her fifteen dollars.

¶4 Emma showered and went to her best friends' (the Twins) house up the street. Emma struggled to tell the Twins what had happened because she "just kept crying." Eventually, Emma told the Twins, their older sister, their mother, and their grandmother what had happened. When they suggested she call the police, Emma refused, not wanting to risk being sent back to California. Emma also blamed herself for the assault because she "was wearing short shorts." A few days later, the Twins' older sister gave Emma a pregnancy test.

¶5 After that day, Haynes began acting differently with Emma, reading her journals, forbidding her from hanging out with the Twins, and getting upset when he found out she had a boyfriend. His behavior around Emma escalated into violence, with him slamming her against the cupboards one time and breaking her vanity mirror on another occasion. Emma "was scared of" Haynes and tried to avoid being alone with him. Sometimes, if they were momentarily alone and people were in other rooms of the house, Haynes "would just randomly come up

and grab [Emma's] face and kiss" her. The kissing kept Emma in fear that Haynes would rape her again.

¶6     One day in 2009, Haynes "started yelling" at Emma when her school sent home a notice about her numerous absences. Haynes pushed Emma out of their front door and told Ashley, "if you don't get that little fucking bitch out of here, I'm going to kill her." Emma was then sent to live with her aunt in California.

*The Disclosure and Investigation*

¶7     While in California, Emma began therapy after having nightmares about the abuse, cutting herself, and attempting suicide. Emma disclosed Haynes's abuse to her therapist, who in turn reported it to the police. When officers contacted Emma, she told them she did not want to press charges because she "wanted to go home," which she still considered to be in Utah with Haynes and Ashley. The officers asked Emma to write a statement to that effect. The note stated, "I, [Emma], feel nothing should be done with this case, I will not break up my family, or have anything happen to them. I'm not willing to discuss what happened sexually to me."

¶8     In early 2010, a social worker from California called Ashley and disclosed that Emma had been sexually abused in Ashley's home but did not say by whom. Ashley then called Emma, but when Emma revealed it was Haynes who had abused her, Ashley hung up the phone because she didn't want to believe Emma. After that, Ashley cut off contact with Emma for the next few years, even when Emma messaged her on Facebook, "I still care about you guys. What happened wasn't my fault. I shouldn't be the one getting blamed for what [Haynes] did to me . . . . I still love you . . . . I want my family back." Ashley continued to ignore Emma, even after Emma moved back to Utah in 2012 to live with her sister.

¶9 In 2014, Ashley's father had an eightieth birthday party and wanted Emma to attend. Ashley reached out to Emma and invited her to the party, and they began talking about the details of the abuse for the first time. Emma's description of how Haynes had kissed her changed Ashley's mind, and she then believed Emma's account. Ashley—no longer married to Haynes but still friends with him—confronted Haynes at a backyard barbecue that day about the abuse allegations. Haynes said nothing in response and "just walked in the house."

¶10 Emma eventually reported the abuse to the police in Utah. Officers interviewed Haynes, who denied the abuse but admitted that he often played a tickling game with Emma and that he broke her vanity mirror. Haynes also suggested Ashley "was coaching" Emma to make these accusations.

*The Charges and Motion for Pre-trial Detention*

¶11 In 2020, the State charged Haynes with one count of rape of a child, three counts of aggravated sexual abuse of a child, and one count of sodomy upon a child. The State simultaneously filed a motion for pre-trial detention arguing that there was "substantial evidence supporting [Haynes's felony] charges" and clear and convincing evidence that he "would constitute a substantial danger to any other individual or to the community." The State pointed to, among other things, Haynes's involvement in the Vagos Motorcycle Club/Gang[4] (the gang) and a recent

---

4. "The 2011 National Gang Threat Assessment designated the Vagos as a criminal organization and 'Outlaw Motorcycle Gang.'" *Godwin v. Rogue Valley Youth Corr. Facility*, No. 1:12-CV-00478-MC, 2017 WL 3816150, at *1 (D. Or. Aug. 31, 2017). An Outlaw Motorcycle Gang is one "whose members use their motorcycle clubs as conduits for criminal enterprises." *Id.* at *1 n. 2 (cleaned up).

assault against Ashley's son (Stepson)—who was Haynes's stepson and like a brother to Emma—by gang members that Haynes may have been involved with. The court granted the motion.

*The Preliminary Hearing*

¶12    At the preliminary hearing on the charges, the State elicited testimony concerning Haynes's association with the gang. A detective (Detective) testified that although Haynes was involved with the gang, he had no gang-related criminal charges apart from the recent investigation into Stepson's assault. The assault took place at a bar in Salt Lake County. According to Detective, the assault allegedly occurred because Stepson was talking to gang members about Emma's allegations against Haynes. Detective also testified that the investigation into the assault provided evidence of Haynes's involvement with the gang. He explained that when police executed a search warrant related to the assault, they found a gang patch. He further testified that Haynes told other gang members on a jail phone call that they could consult with him and get assistance from him.

*The Motions to Dismiss*

¶13    Before trial, Haynes filed a motion to dismiss, claiming his right to due process had been violated by the State's failure to preserve relevant evidence.[5] At a hearing on the pre-trial motion, Haynes alleged that evidence from Emma's disclosure of the abuse to her California therapist in 2010 had been destroyed. When the trial court asked Haynes "precisely what . . . evidence"

---

5. Haynes also filed a post-trial motion to dismiss that raised nearly identical issues as the pre-trial motion. The trial court's oral ruling on the pre-trial motion likewise resembles the court's written ruling on the post-trial motion. Because they are essentially identical, we describe and consider them together.

he believed "was lost or destroyed," Haynes explained that Emma's disclosure in 2010 had set in motion an investigation by, and communication between, California's and Utah's child welfare and law enforcement agencies, but that only some of that documentation still existed because so much time had elapsed. Haynes pointed to the following attachments in his motions:

- a fax cover sheet from California's child welfare agency to Utah's, stating that Emma "disclosed to her therapist forcible [sexual abuse] occurred 2 years ago in" Utah;

- the body of that fax containing the California report sent to law enforcement, stating that "2 years ago, when [Emma] was 14 years old," Haynes "came into her room and forcibly had sexual intercourse with her";

- a dispatch log by the California police stating Emma "refused[] to speak to" the officers and she told them "there was no crime"; and

- an email from a forensic specialist (Expert) at the Utah Children's Justice Center to a detective in which Expert explained that Emma "reported sexual abuse that would have occurred [in Utah] a few years ago to her therapist," but that Emma "denied the abuse" to police and "recanted because she [did] not want the family to be upset with her."

¶14 From these documents, Haynes inferred that there must be more, and potentially exculpatory, documentation about Emma's case. The trial court disagreed and denied the motions to dismiss, finding there "is no evidence that there are any additional" reports from law enforcement or child welfare agencies. The court further explained that "[g]iven that the complaining witness and perpetrator were living in different states and [the complaining witness] did not appear to be in any immediate danger, there is no reason to expect any further investigation or reports from"

California's child welfare agency. Moreover, the trial court found there was "no evidence that any other exculpatory therapist records exist" and Emma's alleged recantation came from comments she made on Facebook, not from supposedly now-destroyed records. Thus, the trial court concluded that Haynes had "not met his burden to establish that the State failed to preserve any evidence, let alone exculpatory evidence," and denied the motions.

*The Rule 404(b) Motion*

¶15 Haynes also filed a pre-trial motion to exclude any mention of any of his prior bad acts under rule 404(b) of the Utah Rules of Evidence. Haynes specifically sought to exclude his gang membership and his prior assaults. The parties stipulated that unless Haynes "open[ed] the door," the State would not admit evidence that (1) Haynes "is a member of the . . . gang," (2) Haynes "has prior assaultive behaviors unrelated to" Emma, and (3) Haynes "has a character trait of being violent."

*The Trial*

¶16 During the three-day jury trial, the State called various witnesses—including Emma, Ashley, one of the Twins (Friend), the Twins' older sister, and their mother—who testified about the events as described above. Emma testified she never told anyone the abuse did not happen or that she "made it up." On cross-examination, Emma was asked about her preparation for trial with the prosecutor. Emma answered that they had met three times in person and had several phone calls. On redirect, the prosecutor asked Emma what the prosecutor had explained was the "most important rule . . . about testifying," and Emma answered, "To tell the truth." Emma was also asked, on cross-examination, about an exchange she had on Facebook with her sister-in-law about Haynes. Emma responded, in part, "[My sister-in-law] never stopped talking to me. She believed me."

Counsel objected, moving to strike the statement as nonresponsive. The trial court overruled the objection and said, "You can't object to your own question, Counsel."

¶17 Counsel did not object, however, to two other similar statements from other witnesses. First, Ashley testified about how she initially did not believe Emma's account but that she later changed her mind and believed Emma. And Friend testified, "I knew something was bothering her," when Emma came over after the assault. When asked how she knew, Friend replied, "Because we, like, knew each other where you can't lie to each other. Like, we knew when something was wrong."

¶18 The State also introduced a yearbook photo of Emma from 2007 and a photo of her on vacation in 2006 to demonstrate how Emma looked around the time of the abuse. Emma testified that during 2007, she would ride bikes, go to the water park, and "hang out with friends. You know, just be kids. Watch TV." She added, "We were still young so it was before . . . social media." The State also introduced a photo of Emma and Haynes together before Emma's prom to demonstrate the size difference between the two and the "physics of what happened" when his body was on top of hers. In the photograph, Emma is wearing a dress while Haynes is wearing a t-shirt with the sleeves cut off that says "just do me," under a symbol that resembles the Nike Swoosh.

¶19 During the defense's case, Counsel called Expert and asked her about her email in which she stated Emma had "recanted" her allegations of abuse. Expert testified she never met Emma, nor did she recall the basis on which she had said Emma recanted; she also offered her view that Emma's statement to the California police asking it not to proceed with the case was not a recantation by Emma. Expert defined the term "recant" as "when a child makes a disclosure of something and then they rescind that disclosure and say never mind, it didn't really happen." Expert

also stated that it is common for children to recant and agreed that lack of family support is a significant factor for recanting or delayed reporting.

¶20 In closing, Counsel emphasized that Haynes had "no burden here" and argued that the State had not met its burden of proof in the case. Counsel asked, "Where are all the other witnesses that [Emma] disclosed to?" and then proceeded to list off names of witnesses that the defense believed the State should have called to testify. In its rebuttal closing, the State explained it did not call more of the witnesses to whom Emma disclosed the abuse because the testimony would be inadmissible as hearsay or it would violate patient-therapist confidentiality. The State also argued that there was "zero evidence, zero, that [Emma] recanted."

¶21 After deliberation, the jury found Haynes guilty on all five counts. He was later sentenced to five concurrent prison terms of fifteen years to life.

ISSUES AND STANDARDS OF REVIEW

¶22 Haynes now appeals and presents numerous issues for review. First, he argues the trial court erroneously denied his motions to dismiss, maintaining that his right to due process was violated because the State destroyed exculpatory evidence. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (cleaned up).

¶23 Next, Haynes argues Counsel rendered ineffective assistance by failing to object to (1) bolstering, (2) other-acts evidence, (3) Expert's testimony on recantation, and

(4) prosecutorial misconduct. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Lisenbee*, 2022 UT App 19, ¶ 8, 505 P.3d 523 (cleaned up).

¶24    Finally, Haynes has also filed a motion under rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court to develop the record on additional ineffective assistance claims. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. The Motions to Dismiss

¶25    Haynes contends his state constitutional due process rights were violated when the trial court denied his motions to dismiss for destruction of evidence. We disagree.

¶26    "It is a matter of clear Utah law that criminal defendants are entitled to information possessed by the State to aid in their defense." *State v. Tiedemann*, 2007 UT 49, ¶ 40, 162 P.3d 1106. But it is equally clear that Utah law requires a defendant making a due process claim based on the loss or destruction of evidence to meet a threshold showing that there is "a reasonable probability that the lost evidence would have been exculpatory." *State v. DeJesus*, 2017 UT 22, ¶ 22, 395 P.3d 111. To meet this threshold requirement, "a defendant must make some proffer as to the lost evidence and its claimed benefit" that "is not pure speculation or wholly incredible." *Id.* ¶ 39. Only after this threshold showing is

met does a court "balance the culpability of the State and the prejudice to the defendant in order to gauge the seriousness of the due process violation and to determine an appropriate remedy." *Id.* ¶ 27.

¶27 Here, the trial court concluded Haynes did not meet the threshold requirement because there was "no evidence that there are any additional" reports from law enforcement or child welfare agencies, and "there [was] no evidence that any other exculpatory therapist records exist." We agree with the trial court that Haynes has fallen far short of his burden here.

¶28 Before Haynes can demonstrate that lost evidence was potentially exculpatory, he must demonstrate that there was lost evidence to begin with. He has presented nothing but speculation on both fronts. A mere inference that because there were *some* reports from law enforcement and child welfare agencies there must have been *more* reports is insufficient to establish a loss of evidence. Because Haynes did not meet the threshold requirement of showing that there was exculpatory evidence or "a reasonable probability that the lost evidence would have been exculpatory," we hold that his state constitutional due process rights were not violated when the trial court denied his motions to dismiss for destruction of evidence. *Id.*[6]

## II. Ineffective Assistance

¶29 Haynes asserts Counsel provided ineffective assistance by not objecting to (1) bolstering, (2) other-acts evidence, (3) expert

---

6. Haynes also argues on appeal that the State violated his due process rights by allowing witnesses' memories to be "lost to time." We decline to address this argument, both because it was not preserved for appeal and because no Utah case law supports such a notion.

testimony, and (4) prosecutorial misconduct. We disagree with respect to all of his claims.

¶30    "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient," meaning that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. Even if counsel "made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. "Second, the defendant must show that the deficient performance prejudiced the defense," in "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. To demonstrate ineffective assistance, both deficient performance and prejudice "must be present." *State v. Herrera*, 2025 UT App 1, ¶ 16, 563 P.3d 416. "If either is lacking, the claim fails, and the court need not address the other." *Id.* (cleaned up).

¶31    Before turning to our analysis of Haynes's claims, we reiterate our court's prior admonition that ineffective assistance of counsel claims are "not an invitation to flyspeck the record and, with the luxury of time and the benefit of hindsight, identify ways in which counsel might have been even more effective." *State v. Boyer*, 2020 UT App 23, ¶ 65, 460 P.3d 569. And we note that "an appellate court has discretion as to the nature and extent of the opinions it renders and we need not address in writing each and every argument, issue, or claim raised and properly before us on

appeal." *State v. Draper*, 2024 UT App 152, ¶ 124, 560 P.3d 122 (cleaned up).

¶32    Here, we have considered each of Haynes's numerous ineffective assistance of counsel claims, but we conclude that none of them demonstrate that Counsel provided constitutionally ineffective assistance. We address below those "claims for which we think some analysis is justified or otherwise helpful." *Id.*

A.    Bolstering

¶33    Haynes asserts Counsel should have objected to several instances of alleged bolstering. We briefly describe then address each in turn, concluding that Counsel did not render ineffective assistance.

1.    Ashley's Testimony that She Believed Emma

¶34    Ashley testified about how she initially did not believe Emma's account of the abuse but then changed her mind and eventually did believe Emma. Haynes argues that Counsel's failure to object to this testimony was deficient performance that prejudiced Haynes because, as he sees it, Ashley offered an opinion on Emma's truthfulness. The State conceded at oral argument that Counsel's performance was deficient on this point. We thus address the prejudice relevant to Ashley's testimony along with another ineffective assistance claim asserted by Haynes, discussed *infra* ¶ 46, in order to assess whether there was cumulative prejudice from the multiple instances of deficient performance. *See infra* ¶¶ 72–78.

2.    Testimony from Friend and Emma

¶35    Haynes asserts that there were additional instances of improper bolstering of Emma and argues that Counsel's failure to

object to this testimony amounted to ineffective assistance.[7] First, Friend testified that when Emma came to her house after the abuse, she "knew something was bothering [Emma]." When asked how she knew, Friend replied, "Because we, like, knew each other where you can't lie to each other. Like, we knew when something was wrong." Second, when responding to a question about whether she ever had a Facebook exchange with her sister-in-law, Emma replied, "[My sister-in-law] never stopped talking to me. She believed me." Although Counsel objected to the nonresponsive element of this particular testimony, he did not object to the statement on bolstering grounds, and Haynes argues this error was deficient performance.[8]

---

7. One of the instances Haynes points to was not bolstering. In response to Counsel's questioning of Emma about her preparation for trial, the prosecutor asked Emma what she had told Emma was the "most important rule . . . about testifying." Emma answered, "To tell the truth." Witnesses do not "bolster" their own testimony by testifying that they are telling the truth. *See State v. Sanchez-Jacobo*, 282 P.3d 880, 886 (Or. Ct. App. 2012) (concluding that "a witness does not impermissibly 'vouch for' or 'bolster' his or her *own* testimony by proclaiming truthfulness"). We therefore decline to further address this claim.

8. Haynes also asserts that failing to strike this testimony was plain error by the trial court. But as we explain below, *see infra* ¶¶ 40–41, it was not deficient performance for Counsel to elect not to object on bolstering grounds. And where Counsel had a strategic reason not to object, it was not plain error for the court not to strike the testimony from the record. *See State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 ("Plain error does not exist when a conceivable strategic purpose exists to support the use of the evidence." (cleaned up)).

¶36    Under the deficient performance prong of *Strickland*, a defendant must "overcome the presumption that the challenged action might be considered sound trial strategy." *Provo City v. Bishop-Garcia*, 2022 UT App 16, ¶ 17, 505 P.3d 81 (cleaned up). Even if a strategic reason for failing to object does not exist, this court must consider "whether correcting the purported error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Id.* (cleaned up).

¶37    Haynes points to *Bishop-Garcia* to support his assertion that this testimony "was obviously inadmissible bolstering." In *Bishop-Garcia*, the defendant argued on appeal that his trial counsel provided ineffective assistance, in part because counsel failed to object to two statements by a police officer witness that commented on the victim's truthfulness. *Id.* ¶¶ 1, 15, 19. First, the prosecutor asked the officer whether he found the victim "to be credible," to which the officer replied, "Yes." *Id.* ¶ 21. Second, when asked by the prosecutor why he arrested the defendant, the officer explained that the victim's statements were "consistent" and "not changing," whereas the defendant's statements were not consistent. *Id.* ¶ 22. This court explained that though "merely observing that a witness's statements are consistent does not necessarily amount to bolstering," the officer in this instance did not only "state that [the victim's] account was consistent." *Id.* Rather, "in context the officer gave the equivalent of an affirmative statement that [the defendant] was being untruthful when he interviewed him." *Id.* (cleaned up). Thus, this court concluded both statements warranted an objection under rule 608(a) of the Utah Rules of Evidence. *Id.*

¶38    Recently, this court was asked to consider a similar issue. In *State v. Herrera*, 2025 UT App 1, 563 P.3d 416, the defendant also argued ineffective assistance of counsel on appeal, comparing the statements made by a police officer witness in his trial with the

statements of the officer in *Bishop-Garcia*. The prosecutor asked the officer, "After your interview of [the defendant], was there anything else of note that occurred—that you did?" *Id.* ¶ 25. In response, the officer said, "I made a decision kind of with his inconsistencies of the interview, the statements, injuries, and stuff—I mean, I made an ultimate decision to place him under arrest." *Id.* ¶ 24.

¶39 This court disagreed with the defendant's assessment that the situation was like that in *Bishop-Garcia*. *Id*. We explained that in *Bishop-Garcia*, counsel's performance was deficient because counsel had "ample opportunity to object and prevent the error where the prosecutor *overtly* elicited each instance of inadmissible testimony." *Id.* ¶ 25 (emphasis added) (cleaned up). However, in *Herrera*, the prosecutor did not overtly elicit inadmissible testimony. *Id.* In fact, "it would have been impossible for counsel to predict that [the] officer was going to respond to the [prosecutor's] general question with a statement discussing [the defendant's] credibility." *Id.* (cleaned up).

¶40 Based on the facts before us, the testimony at issue in the present case more closely resembles the situation in *Herrera* than the situation in *Bishop-Garcia*. Counsel could not have expected Friend would say that she and Emma could not "lie to each other" in response to the general follow-up question, "How did you know that [Emma was upset]?" Nor could Counsel have predicted that Emma would respond to a simple question about whether she ever had a Facebook exchange with her sister-in-law with a comment that her sister-in-law believed her.

¶41 When a witness "spontaneously volunteer[s] an inadmissible opinion, Counsel ha[s] to decide whether to object and request a curative instruction." *Id.* ¶ 26. "Deciding whether to object to testimony and request a curative instruction after the jury already heard it is a strategic decision." *Id.* (cleaned up). After

all, the act of objecting, combined with the instruction from the trial court to disregard the testimony, may well solidify the particular testimony in the mind of the jurors when they were otherwise inclined to dismiss or ignore it. *See State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96 ("[W]e have often held that decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess."); *State v. Tippets*, 2021 UT App 137, ¶ 29, 501 P.3d 570 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony." (cleaned up)). Accordingly, declining to object and request an instruction "may be considered sound trial strategy." *Herrera*, 2025 UT App 1, ¶ 26 (cleaned up). Thus, in this situation, Counsel did not perform deficiently.

B.     Other-Acts Evidence

¶42     Haynes asserts that Counsel failed to object to the introduction of a litany of evidence that he claims was inadmissible other-acts evidence under rule 404(b) of the Utah Rules of Evidence. We categorize this testimony as follows: (1) Haynes's "tickling" of Emma and post-rape behavior by Haynes and Emma, (2) three photographs of Emma around 2007, and (3) a screenshot of Emma's Facebook message to Ashley.[9] The State asserts these claims are inadequately briefed but, even if they were, Haynes's list does not constitute impermissible other-

---

9. The State admitted the screenshot as two separate exhibits. However, the exhibits are photos of the same message. Because of this, we refer to the screenshot in the singular.

acts evidence.[10] We agree with the State that the evidence does not fall within the prohibitions of rule 404(b) and that Counsel did not perform deficiently in failing to object.

¶43    Generally, other-acts evidence "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). An exception to this rule arises where a proper non-character purpose exists for the admission of the evidence. *Id.* R. 404(b)(2); *State v. Fredrick*, 2019 UT App 152, ¶ 41, 450 P.3d 1154. "The threshold [rule] 404(b) question is whether the evidence has a plausible, avowed purpose beyond the propensity purpose that the rule deems improper. If it does then the evidence is presumptively admissible (subject to rule 402 and 403 analysis)." *State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (emphasis omitted).

1.    Tickling and Post-rape Behavior

¶44    The first category of other-acts evidence Haynes takes issue with Counsel not objecting to includes Haynes's pre-rape "tickling" of Emma, Haynes's post-rape kissing of Emma, Haynes's post-rape violence toward Emma, and Emma's post-rape mental health. Here, none of this evidence was admitted to show that Haynes "acted in conformity" with these other acts. Utah R. Evid. 404(b)(1). Instead, this evidence explained the relationship between Haynes and Emma.

¶45    The pre-rape tickling goes to show why Emma would be naive to the rape, while Haynes's post-rape behavior—including

---

10. We observe that it is inherently difficult for an appellant to adequately brief all of his arguments when asserting nearly thirty of them. Although we have declined to address some of Haynes's arguments, *see supra* ¶¶ 31–32, we have elected to address the arguments identified here.

getting upset when Emma had a boyfriend, slamming her against the cupboards, breaking her vanity mirror, and kissing her—demonstrates control in the relationship and Haynes's consciousness of guilt. And all of this evidence speaks to why Emma delayed reporting the rape. These are plausible purposes beyond propensity, and therefore, the evidence would be presumptively admissible. *See State v. Tanner*, 675 P.2d 539, 546 (Utah 1983) (holding that "evidence of specific instances of the defendant's treatment of the child is relevant to establish . . . a specific pattern of behavior by the defendant toward one particular child"), *abrogated on other grounds by State v. Deporto*, 935 P.2d 484 (Utah 1997). Because the evidence was admissible, reasonable counsel would have no need to object. Thus, Counsel was not ineffective by failing to object to this category of other-acts evidence.

2.      Photographs of Emma

¶46     The second category of other-acts evidence Haynes takes issue with Counsel not objecting to is a series of three photographs: two that show Emma around the time of the rape and one that shows Emma and Haynes together to demonstrate the size difference between the two at the time the rape occurred.[11] Haynes argues that Counsel should have objected to these photographs because they were irrelevant and their probative value was substantially outweighed by the risk of unfair prejudice to Haynes. *See* Utah R. Evid. 401 & 403. Here, we elect to evaluate this issue on prejudice. *See Strickland v. Washington*, 466 U.S. 668,

---

11. Haynes presented his argument regarding the photographs as one concerning "other-acts evidence," which is addressed by rule 404(b) of the Utah Rules of Evidence. Although we analyze the argument under rules 401 and 403 of the Utah Rules of Evidence, we nonetheless include it under the "other-acts evidence" heading for organizational convenience.

697 (1984) ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."). We address later in this opinion whether Haynes suffered prejudice from Counsel's failure to object to the photographs. *See infra* ¶¶ 72–78.

3.      Screenshot of Messages

¶47    The final category of other-acts evidence that Haynes argues Counsel should have objected to is a screenshot of a Facebook message Emma sent to Ashley. In the message, Emma states that she "shouldn't be the one getting blamed for what [Haynes] did" and the two of them "should talk about this like adults." Haynes argues that Counsel's failure to object was deficient because the message was "substantially more unfairly prejudicial than probative." *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). We disagree.

¶48    Haynes's defense was to attack Emma's credibility. Counsel told the jury during his opening statement that Emma "changed her story over the years," and in his police interview, Haynes explained away Emma's allegations against him by saying that Ashley "was coaching her." Counsel could have rightly assumed that the screenshot would be admissible as a prior consistent statement to show that Emma told Ashley about the incident prior to any alleged coaching. *See* Utah R. Evid. 801(d)(1)(B). Thus, Counsel could have reasonably determined that any objection to the screenshot under rule 403 would be unsuccessful. Therefore, it was not deficient performance for Counsel not to object to the screenshot.

C.      Expert Testimony

¶49     Haynes contends Counsel was ineffective in relation to testimony from Expert—a witness called by Counsel during Haynes's case-in-chief—in several instances: (1) when Counsel failed to object to Expert's testimony that recantation is common among children in sex abuse cases, (2) when Counsel failed to object to Expert's testimony that Emma did not want to disclose her allegations or know what recantation meant, and (3) when Counsel failed to clarify Expert's opinion about Emma's recantation. We do not find Counsel's performance to be deficient on any of these grounds.

1.      Commonness of Recantation

¶50     As an initial matter, there is no merit to Haynes's insinuation that Expert was not a qualified expert witness. Under rule 702(a) of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). For specialized knowledge to "serve as the basis for expert testimony," there must be "a threshold showing that the principles or methods that are underlying in the testimony . . . are reliable, . . . based upon sufficient facts or data, and . . . have been reliably applied to the facts." *Id.* R. 702(b). Our supreme court has clarified that a "threshold showing is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community or if the testimony meets a threshold showing of reliability." *State v. Lopez*, 2018 UT 5, ¶ 21, 417 P.3d 116 (cleaned up).

¶51 Here, both Haynes and the State elicited testimony from Expert that met this threshold showing. Expert has worked with child abuse victims for nearly twenty years. In various roles with the Utah Children's Justice Center, she monitored interviews of children, conducted research, and provided resources for families to navigate the justice system. At some points in her career, she oversaw approximately six to seven thousand child abuse cases a year. And Expert has published articles for the federal government and spoken on news programs about recantations by children.

¶52 Notwithstanding these qualifications, Haynes challenges Expert's testimony that "almost 25 percent of kids in sex abuse cases recant the allegation." He asserts that "[t]here was no showing that [Expert's] anecdotal data had statistical validity," citing both *State v. Rammel*, 721 P.2d 498 (Utah 1986), and *State v. Iorg*, 801 P.2d 938 (Utah Ct. App. 1990). In *State v. Garcia-Cardiel*, 2024 UT App 174, 561 P.3d 692, *cert. denied*, 564 P.3d 959 (Utah 2025), this court recently distinguished these two cases from the situation before it. There, the defendant claimed that an expert's statement that there is "some research that suggests that 60 to 80 percent of all [child] abuse is not reported at all or not reported until adulthood resemble[d] the inadmissible probability evidence in" both *Rammel* and *Iorg. Id.* ¶ 20 (cleaned up). We disagreed.

¶53 In *Rammel*, "a detective testified that he did not think it was unusual for [an] accomplice to have lied during his first interrogation because most suspects lie when initially questioned by police." *Id.* ¶ 21 (cleaned up). Our supreme court found this testimony to be inadmissible and noted that "probabilities cannot conclusively establish that a single event did or did not occur and are particularly inappropriate when used to establish facts such as whether a particular individual is telling the truth at any given time." *Id.* (cleaned up).

¶54 In *Iorg*, "an officer testified that at least fifty percent of the thirty abuse victims she had worked with waited more than a year to report the abuse," going on to opine "that delayed reporting was not an indication of the charge being fabricated or being untrue." *Id.* (cleaned up). The *Iorg* court held that the "officer's testimony had the same potential for prejudice as the testimony condemned in *Rammel* because the anecdotal statistical evidence weighed in on the victim's truthfulness." *Id.* (cleaned up).

¶55 Our court held that the testimony at issue in *Garcia-Cardiel* was materially different from the testimony at issue in both *Rammel* and *Iorg* because the expert's "testimony about delayed reporting was neither anecdotal nor used to bolster [other witnesses'] truthfulness. Instead, [the expert's] 60 to 80 percent figure came from his experience interviewing victims" and the expert "never testified specifically about [the victims'] disclosures; he spoke only in general terms about delayed reporting of child abuse." *Id.* ¶ 22.

¶56 Counsel could have reasonably determined that Expert's testimony was not anecdotal and did not address Emma's truthfulness. Expert's testimony that "almost 25 percent of kids in sex abuse cases recant" was admissible because Expert has performed research in her field related to recantation, and she was not opining as to Emma's truthfulness. Reasonable counsel could have believed this testimony was admissible on these grounds, and therefore failure to object was not deficient performance.

2. Expert's Responses to Questions About Emma's Testimony

¶57 Haynes argues that Counsel performed deficiently by not objecting to two parts of Expert's testimony: first, when Expert read aloud Emma's testimony that she did not want to disclose the abuse and, second, when Expert repeated Emma's testimony that Emma did not know what "recant" meant. Haynes asserts that Counsel should have objected to this testimony because

Expert was relying "on anecdotal experience with others" and was not qualified to "opine" on Emma's knowledge of the word recant. Haynes mischaracterizes the testimony that occurred.

¶58 On cross-examination, the State asked Expert to read a portion of Emma's preliminary hearing testimony. Then, the following exchange occurred:

> Q: [R]eviewing this passage from [Emma's] testimony, do you have an opinion as to whether or not the child did not want to disclose the abuse?
>
> A: Um, she said so. She tells the reason in her own words.
>
> Q: Okay. And what are those words that are significant to you?
>
> A: Um, that it was just easier to keep it a secret, and she still had some kind of parts of a relationship going with people at the time so it was easier just to keep the other things a secret.
>
> Q: And does she describe in that passage that . . . she didn't understand the word "recant"?
>
> A: Yeah, she didn't know what that word meant.

¶59 Based on this line of examination, it is evident that Expert was not relying on anecdotal evidence, her experience with others, or her training and experience in general. Expert merely responded to questions about Emma's own testimony that were clear from Emma's testimony itself. Expert made no comment on whether Emma was being truthful in relation to that testimony. Because reasonable counsel could assume that these portions of

Expert's testimony were admissible, Counsel was not deficient in failing to object.

3.      Expert's Opinion About Emma's Recantation

¶60     Haynes contends that Counsel acted unreasonably by failing to "clarify" Expert's testimony that Emma's written statement to California law enforcement officers was not a recantation and should have asked Expert "whether the record of [Emma] telling . . . officers that no crime occurred was a recantation." Haynes argues that this "left the impression that [Expert], applying her expertise to sufficient facts, opined that evidence did not support recantation, despite [Expert's] email indicating recantation."

¶61     Again, Haynes mischaracterizes the record. On cross-examination, the State asked Expert to read aloud the following statement Emma made to California law enforcement officers: "I, [Emma], feel nothing should be done with this case, I will not break up my family, or have anything happen to them. I'm not willing to discuss what happened sexually to me."

¶62     After Expert read the statement aloud, her testimony went as follows:

> Q: So in your opinion, based on your many years of being an expert in this area, is this a recantation?
>
> A: It's not.
>
> Q: What is this really describing?
>
> A: It's acknowledging something happened but the child isn't in a position to talk about it right now, because she's worried about the impact to her family.

Accordingly, Expert testified only as to whether Emma's written statement was a recantation.

¶63   Haynes makes much of Expert's email from 2010, but this email does not change Expert's testimony about Emma's written statement. The portion of the email Haynes relies upon reads as follows: "The child is stating that the allegations are true but she recanted because she does not want the family to be upset with her." When asked about her statement in the email that Emma "recanted," Expert testified that she could not remember why she used that word or where she got the information, and she confirmed that she did not speak with Emma. Thus, reasonable counsel would not need to further clarify Expert's opinion on Emma's written statement or ask further questions about the email. And at this point in the testimony, Counsel could have reasonably concluded that any additional questioning was only going to further solidify—and emphasize for the jury—Expert's opinion that Emma had not recanted. Accordingly, Counsel did not perform deficiently.

¶64   In sum, it was not deficient performance for Counsel to fail to object to or clarify any of Expert's testimony. Thus, Counsel did not render ineffective assistance.

D.   Prosecutorial Misconduct

¶65   Finally, Haynes argues Counsel was ineffective for not objecting to two instances that he asserts constitute prosecutorial misconduct: (1) the prosecutor's statement in closing argument that the rules of evidence prevented bringing in more witnesses and that there was "zero evidence" of Emma recanting, and (2) the prosecutor eliciting Detective's testimony recounting Haynes's statement to police that Ashley coached Emma to accuse him. We determine that Counsel's performance in these regards was not ineffective.

1.      Rules of Evidence and "Zero Evidence" Statement

¶66     Haynes complains that the prosecutor's statements during closing argument that there was "zero evidence" Emma had recanted her allegation of rape against Haynes and that the rules of evidence prevented the State from calling more witnesses constituted prosecutorial misconduct. Prosecutors have considerable freedom to discuss "properly admitted evidence and reasonable inferences that may be drawn from it." *State v. Dew*, 2025 UT App 22, ¶ 58, 566 P.3d 53, *cert. denied*, Apr. 23, 2025 (No. 20250288). "When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection." *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (cleaned up).

¶67     Even if we agreed with Haynes that the State's arguments were improper, we conclude that they were not "so improper as to render trial counsel ineffective for not objecting to [them]." *See State v. Hulse*, 2019 UT App 105, ¶ 44, 444 P.3d 1158 (cleaned up). The prosecutor's comments about there being "zero evidence" that Emma recanted and the inability to call additional witnesses were dispersed throughout a longer rebuttal closing argument. *See id.* ¶¶ 43–44. And Counsel may have had strategic reasons for not objecting, including to avoid further highlighting the testimony by Expert that Emma did not recant and calling attention to the many more witnesses that Emma told about the abuse. *See State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96 (explaining "the pink-elephant paradox" where "by being told *not* to think about a thing, jurors may actually be more likely to think about that thing").

¶68     Moreover, the "failure of defense counsel to object to statements made by a prosecutor during the closing is a matter to

which we attach significance." *State v. Redcap*, 2014 UT App 10, ¶ 33, 318 P.3d 1202 (cleaned up), *abrogated on other grounds by State v. Wall*, 2025 UT App 25, 556 P.3d 726. "It is not only a sign that what was said sounded less exciting at trial than appellate counsel now would have it seem, but it is also some indication that the tone and manner of the now challenged aspect of the prosecutor's argument were not unfairly prejudicial." *Id.* Thus, we are reticent to second-guess Counsel's strategic decision not to interrupt closing argument with an objection. Therefore, we conclude that Counsel's performance was not deficient in failing to object during closing argument.

2.      Eliciting Haynes's Statements About Coaching

¶69     Haynes finally contends that Counsel was ineffective for not objecting to the prosecutor eliciting testimony from Detective that when he asked Haynes why Haynes had sexual activity with Emma, Haynes's response was that Ashley had coached Emma. Haynes asserts that the State eliciting this testimony was prosecutorial misconduct. It is first important to note that the testimony did not come from Haynes directly because he did not testify at trial. Thus, he was not asked under oath to comment on the veracity of another witness. Rather, Haynes's statements were made during his police interview, and the jury heard them recounted by Detective. The relevant part of Detective's testimony is as follows:

> Q: I'm assuming that [Haynes] was asked in this interview whether any sexual activity happened between him and [Emma]?
>
> A: Yes.
>
> Q: And what did he say about that?
>
> A: He said, "No, never."

Q: Okay. Did he say any reason why he thought [Emma] would be saying that he had had sexual activity with her?

A: He said that . . . [Ashley] . . . was coaching her.

¶70 This testimony was admissible as a statement of a party opponent, *see* Utah R. Evid. 801(d)(2), and it was actually beneficial to Haynes. Without having to take the risk of testifying at trial, Haynes was able to have the jury hear that he denied the allegations and also hear his theory of the case—Emma was coached by Ashley. Thus, it was reasonable for Counsel not to object to the testimony.

¶71 Because Counsel's failure to object to any of the alleged instances of prosecutorial misconduct was not deficient, Counsel did not provide Haynes ineffective assistance.

E.    Cumulative Prejudice

¶72 We identified above one instance where the State conceded that Counsel's performance was deficient—failing to object to Ashley's testimony that she changed her mind and believed Emma, *see supra* ¶ 34—and one instance where we assumed that Counsel's performance was deficient—failing to object to the admission of the photographs of Emma and of Emma and Haynes together, *see supra* ¶ 46. We now consider whether these two instances of Counsel's deficient performance prejudiced Haynes. *See State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160.

¶73 To reverse under the cumulative error doctrine, this court "must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038; *see also State v. Wright*, 2013 UT App 142,

¶ 44, 304 P.3d 887 (citing cases where our supreme court has declined to apply the cumulative error doctrine). For purposes of this analysis, we assume that each of these errors, standing alone, had a "conceivable potential for harm." *Martinez-Castellanos*, 2018 UT 46, ¶ 42. We next examine whether the cumulative effect of these two errors prejudiced Haynes.

¶74 "To evaluate prejudice under *Strickland*, we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance." *State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 (cleaned up). And "we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." *Id.* (cleaned up). Applying this analysis here, we are not convinced that "there is a reasonable probability the result would have been better for" Haynes if the trial proceeded without both Ashley's testimony and the photographs. *State v. Garcia-Flores*, 2021 UT App 97, ¶ 28, 497 P.3d 847.

¶75 The State presented strong evidence that Haynes had raped Emma. The jury heard testimony from multiple witnesses that Emma consistently maintained that Haynes raped her, including Emma's testimony about the various people she told about the rape over the years; testimony from Friend, the Twins' older sister, and their mother that Emma contemporaneously reported the rape to them and the Twins' grandmother; and Emma's report of the rape to her therapist. The jury also heard testimony about Haynes's change in behavior towards Emma after the rape, and Emma's testimony about her mental health struggles.

¶76 Though Ashley's testimony about changing her mind and believing Emma added to the mix of evidence before the jury, there was substantial evidence of the rape without her testimony, and we are not persuaded that Ashley's testimony had a

significant impact on the outcome of the trial. *C.f. State v. Nunes*, 2020 UT App 145, ¶ 23, 476 P.3d 172 (explaining that "most jurors are likely to assume that a mother will believe accusations of sexual abuse made by her own children" and as a result this evidence likely did not have a "significant impact on the jury's decision to convict" (cleaned up)).

¶77 The same is true for the photographs. Indeed, the photographs likely had little, if any, impact on the jury reaching a guilty verdict where they were merely used to demonstrate Emma's appearance in her youth and her size relative to Haynes. And we do not agree with Haynes's characterization of the photograph in which Haynes was standing next to Emma wearing a t-shirt with the phrase "just do me" as "portray[ing] [Emma] as a princess, [and] Haynes as a sex-hungry slob." The photograph simply shows the two of them standing side-by-side posing for the picture, with Emma smiling widely.

¶78 Accordingly, we see no reasonable probability that Haynes would have been acquitted had the trial proceeded without both Ashley's testimony and the photographs. Thus, the cumulative effect of these two errors does not "undermine[] our confidence that a fair trial was had." *See Martinez-Castellanos*, 2018 UT 46, ¶ 39 (cleaned up).

### III. The Rule 23B Motion

¶79 In his rule 23B motion, Haynes requests this court remand the case to the trial court to supplement the record on six additional ineffective assistance claims that boil down to alleged failures to adequately investigate or to call particular witnesses to testify. We deny his request.

¶80 "A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim

of ineffective assistance of counsel." Utah R. App. P. 23B(a). Yet a rule 23B motion is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* Consequently, to succeed on a rule 23B motion, "a defendant must present the court with the evidence he intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Schoenenberger*, 2024 UT App 187, ¶ 64, 562 P.3d 1174 (cleaned up).

¶81 To support the many ineffective assistance claims that Haynes asserts against Counsel in his motion, he attached three affidavits and two exhibits. The State contends "Haynes has not presented facts, which, if true, could prove that Counsel was ineffective." We have reviewed the affidavits and exhibits and determined that none of the claims presented have merit. We elect to address only two. *See Carter v. State*, 2012 UT 69, ¶ 16 n.7, 289 P.3d 542 ("This court need not analyze and address in writing each and every argument, issue, or claim raised . . . Rather, it is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court." (cleaned up)).

A. Testimony from Nephew

¶82 Haynes provided an affidavit wherein he stated that he instructed Counsel to present testimony at trial from his nephew (Nephew), who "spent a lot of time at [his] house" during the time that Emma lived with Haynes. Haynes also provided an affidavit from an investigator that discusses the investigator's conversation with Nephew. Nephew was willing to testify that Haynes's house had too many people in it for sexual abuse to go unnoticed and that Emma's first sexual experience was in 2008 with her boyfriend rather than with Haynes. We do not think this

testimony is evidence that supports either prong of the ineffective assistance of counsel test.

¶83    It would not have been unreasonable for Counsel to decline to call Nephew as a witness because, without more, the bare number of people living in a home has no bearing on whether sexual abuse could occur. Because this argument is rather weak, it was not only reasonable to choose not to bring it, but failure to do so would not have been prejudicial to Haynes. Such a weak argument was unlikely to resonate with the jury.

¶84    Nor would testimony that Emma told Nephew that her first sexual experience happened in 2008 with her boyfriend add much to Haynes's case. As with Nephew's other testimony, it would have been reasonable and not prejudicial for Counsel to decline to have Nephew testify to Emma's statement. Because there is a significant difference between a rape and a first consensual sexual experience, it is understandable, and within the common sense of a juror, that, even if she had a sexual experience after the rape occurred, Emma would have still said that the consensual experience was her first sexual experience. Such a statement is not inherently false and would not have proved that Emma was lying. Thus, Nephew's testimony could not demonstrate that Haynes received ineffective assistance of counsel.

B.    Testimony from Relative

¶85    Haynes also stated in his affidavit that he instructed Counsel to present testimony at trial from Stepson's widow (Relative)—who "spent a lot of time at [Haynes's] house and around both" Ashley and Emma—but that Counsel told Haynes that he decided not to present Relative's testimony because doing so "would 'open the door' to the State presenting evidence that [Haynes] was a member of the [gang]." The investigator's affidavit discusses his conversation with Relative. Relative was

willing to testify that Emma "was a liar," that Emma admitted to her that Emma's boyfriend sexually assaulted her, and that Emma falsely accused Haynes.

¶86 While it is possible that evidence of Emma's reputation for dishonesty and of an admission that she falsely accused Haynes could have benefited Haynes's case, Counsel's decision not to call Relative as a witness was not unreasonable when viewed in the broader context. After the State filed charges against Haynes, it filed a motion for pre-trial detention, which the court granted, alleging information about Haynes's association with the gang. Testimony by Detective at the preliminary hearing confirmed that Haynes was involved with the gang and that some members of the gang believed that the assault of Stepson was related to Emma's allegations against Haynes.

¶87 Counsel was representing Haynes when the motion for pre-trial detention was filed and at the preliminary hearing, and was well aware that this damaging information about Haynes's involvement with the gang could potentially be presented at trial. Not surprisingly, Counsel filed a motion in limine to exclude all evidence about the gang, which the court granted. The court's order noted that evidence of Haynes's involvement in the gang would be excluded "unless [Haynes] open[ed] the door."

¶88 Haynes now maintains that presenting Relative's testimony would not have opened "the door for the State to present evidence of Haynes's membership in" the gang and that the reason Counsel tried to exclude evidence of Haynes's gang involvement was speculative. But based on the record before us, it is clear that the risk was high that the gang-related evidence could have come in at trial had Haynes put Relative on the stand. Relative was Stepson's widow, and it is likely that the court would have permitted questions regarding the gang's involvement with the assault on Stepson, his death, and any effect the gang had on

both Relative's willingness to testify and on the substance of her testimony. Relative's testimony presented a real risk of undermining Haynes's victory on the motion in limine excluding the gang evidence. Thus, we cannot say that it was an unreasonable strategic choice for Counsel to decide not to present testimony from Relative in order to prevent the jury from hearing any testimony about Haynes's involvement with the gang. And "we will not second-guess trial counsel's legitimate strategic choices" in assessing a claim of deficient performance. *State v. Dew*, 2025 UT App 22, ¶ 64, 566 P.3d 53, *cert. denied*, Apr. 23, 2025 (No. 20250288).

¶89    In sum, we conclude that Haynes has failed to establish that Counsel was ineffective for failing to call Nephew and Relative to testify at trial. Accordingly, we deny his motion for a rule 23B remand.

## CONCLUSION

¶90    The trial court did not err in denying Haynes's motions to dismiss for lost evidence. Haynes has not carried his burden of demonstrating that Counsel provided constitutionally ineffective assistance. We also deny Haynes's rule 23B motion for remand. Thus, we affirm Haynes's convictions.

_____